THE STATE OF MONTANA, Plaintiff and Respondent, v.
RAMONA LUCERO, Defendant and Appellant.

No. 11493.
Decided Oct. 1, 1968.
445 P.2d 731.

Guy C. Derry (argued), Billings, Harold F. Hanser (argued), Billings, for appellant.

Forrest H. Anderson, Atty. Gen., Helena, Donald Douglas (argued), Asst. Atty. Gen., Helena, John L. Adams, Jr., (argued), County Atty., Billings, for respondent.

MR. JUSTICE HASWELL delivered the Opinion of the Court.

This is an appeal by defendant from a manslaughter conviction involving the death of her husband by stabbing. The case was tried by jury in the district court of Yellowstone County before the Honorable E. E. Fenton, District Judge.

The principal question in this appeal is the admission in evidence at the trial of a written statement signed by defendant in the Yellowstone County jail about two and one-half hours after her arrest and incarceration. The statement was secured by a deputy sheriff during his interrogation of the defendant without counsel at 2:40 o'clock a. m.

Defendant is Ramona Lucero, a 34 year old American of Mexican descent. She was born in Montana and lived here most of her life, working in the sugar beet fields. Her formal schooling had terminated in the third grade. Defendant usually spoke Spanish although she could and did speak English reasonably well. She had some difficulty reading English.

The victim in this case was John Lucero, defendant's husband. He, the defendant, and Patrick Little Boy, an Indian from Lodge Grass who was spending the night at a nearby house, were in the Lucero residence on Billings' south side late in the evening of September 29, 1967. The evidence, both direct and circumstantial, is conflicting as to just what happened thereafter.

According to Patrick Little Boy, he left the Lucero residence within five or ten minutes and returned to the nearby house where he was staying overnight. He then went to an outside privy and while there something directed his attention to the Lucero house. He got "curious," observed defendant going from the Lucero house to their landlord's house nearby, walked over to the bedroom window of the Lucero house, and looked in. He saw John Lucero sitting on the bedroom floor, holding his side, with blood on the floor.

Defendant testified at the trial that she was sitting on the bed in the Lucero bedroom when her husband tried to kill her with a knife. She pushed his knife hand away, got out of his grasp, and ran outside. She doesn't remember where she went then but eventually she returned and found her husband in the bedroom of their house sitting on the floor. She thought he was just drunk, got him onto the bed, opened his trousers, but didn't observe that he was hurt. She didn't see any blood on the floor. She was changing her dress when the law enforcement officers arrived.

Deputy Sheriff Jake Bromgard and Deputy Sheriff Nile Proffer arrived at the Lucero residence in separate cars about 12:05 a. m., having been summoned there by Patrick Little Boy. When they arrived they observed defendant standing in the doorway between the kitchen and the bedroom pulling her dress down. There was a light on in the kitchen but no light bulb in the bedroom. They found defendant's husband lying in blood on a bed in the bedroom. The floor was covered with blood and bloody rags and there was a bloody mop in the kitchen. A quilt type covering was hanging over the bedroom window.

John Lucero had no pulse. A short time later the coroner arrived and pronounced him dead. The cause of death was a stab wound in the general area of the groin that had severed the main artery in his leg causing him to bleed to death.

Some three or four minutes after Deputy Bromgard's arrival

at the Lucero house and before the coroner arrived, he took defendant into custody and put her in his car. According to Deputy Bromgard, defendant was "under the influence of alcohol" at that time. He told her she was under arrest "for an assault on her husband" and took her to jail, arriving there at 12:15 a. m.

Deputy Bromgard returned to the Lucero residence and continued his investigation. He returned to the jail and shortly before 2:40 a. m. he and Betty Weeks, the matron and deputy sheriff, went to defendant's cell. They found defendant sleeping in her cell, awakened her with some difficulty, told her that her husband was dead, and said they wanted to talk to her "concerning her husband."

According to Deputy Bromgard, he orally gave her the Miranda warning from memory, defendant voluntarily consented to give them a statement, and they went to an interrogation room. Upon arriving at the interrogation room, Deputy Bromgard read the Miranda warning and the waiver of her constitutional rights to defendant from two printed paragraphs at the top of the sheet on which defendant's statement was subsequently taken. Defendant said she understood them and signed the waiver of her constitutional rights.

Deputy Bromgard then began his interrogation, taking down the information secured in his own handwriting in narrative form. Upon completion he read the printed Miranda warning, the waiver, and what he had written. Defendant then signed the statement on the bottom of each of the five pages on which the statement was written.

Broadly speaking, defendant's statement consisted of a categorical denial that she stabbed her husband, provided her with an alibi, and tended to cast suspicion on Patrick Little Boy. It differed from her testimony at the trial in some respects. The main difference was that the statement indicated she went to an outside privy, leaving her husband and Patrick Little Boy in the house, and on her return found Patrick Little Boy

gone and her husband sitting on the bedroom floor bleeding.

On October 2, 1967, the county attorney charged defendant with murder. Thereafter an attorney was appointed by the district court to represent defendant, she entered a plea of "Not Guilty" and trial commenced on November 27, 1967.

During the course of the trial, the admissibility of defendant's statement in evidence became an issue. The trial judge received foundation testimony outside the presence of the jury relating to the circumstances under which the statement was given and after indicating that he considered the statement admissible, the foundation testimony was again given in the presence of the jury. The statement was then admitted in evidence over defendant's objection. Thereafter Deputy Bromgard, who was then on the witness stand, was permitted to read the entire statement to the jury, including the Miranda warning and the waiver of constitutional rights, in the manner he had read the same to defendant prior to her signing it.

The jury found defendant guilty of manslaughter and she was subsequently sentenced to six years in the state prison. After denial of defendant's motion for a new trial, the defendant appealed from the judgment.

At the outset, we grant the State's application for correction of the transcript on appeal at page 244 to show that certain proceedings were had in chambers outside the presence of the jury rather than in the courtroom in the presence of the jury. This correction is uncontested.

The issues presented for review by defendant can be summarized in this manner: (1) the admissibility of defendant's statement, (2) permitting witness Bromgard to read defendant's statement to the jury, (3) refusal to strike the testimony of FBI agent Kelleher, (4) error in the giving or refusal of five jury instructions.

The principal issue for review is the admission of defendant's statement in evidence by the trial judge. Defendant contends that her statement is inadmissible under federal con-

stitutional standards, relying principally on Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694.

To achieve perspective, a review of United States Supreme Court decisions in this area is indicated prior to application of these principles to the instant case.

■■ Under the Fifth Amendment to the United States Constitution, no person can be compelled in any criminal case in federal court to be a witness against himself; under the Sixth Amendment to the United States Constitution, a person accused of crime in a federal court has the right to assistance of counsel for his defense. These rights are guaranteed to persons accused of crime in state courts under state criminal law through the Fourteenth Amendment to the United States Constitution which provides that no state shall deprive any person of his life or liberty without due process of law. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653; Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. The constitutional right to counsel and the constitutional right against self-incrimination attach prior to any court proceedings at such time as the police investigation shifts from a general investigation of an unsolved crime to a focus on a particular suspect. Escobedo v. State of Illinois, supra; Miranda v. State of Arizona, supra.

■■ Thus, where police investigation has focused on a particular suspect who is held in police custody, law enforcement officers must adopt effective safeguards securing the suspect's constitutional right against self-incrimination prior to questioning him in order to render any statements he makes admissible in evidence against him at his trial. Miranda v. State of Arizona, supra. Miranda requires, in the absence of other equally effective safeguards, the following warnings to be given the suspect in a meaningful and understandable manner: (1) that he has the right to remain silent, (2) that any statement he does make may be used in evidence against him, (3) that he has the right to the presence of an attorney, either

retained or appointed, during police interrogation, (4) that he may stop answering questions at any time during the interrogation.

The constitutional right to counsel and the constitutional right against self-incrimination may, of course, be waived. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Escobedo v. State of Illinois, supra; Miranda v. State of Arizona, supra. However, such waiver must be made voluntarily, knowingly, and intelligently or it is ineffective. Escobedo v. State of Illinois, supra; Miranda v. State of Arizona, supra. The prosecution has the burden of proof of waiver of constitutional rights. Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70. This burden of proof is heavy and the standards required for waiver are high. Miranda v. State of Arizona, supra. Courts indulge in every reasonable presumption against waiver of fundamental constitutional rights and will not indulge in any presumption of waiver. Johnson v. Zerbst, supra; Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314; Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997; Carnley v. Cochran, supra.

This Court has previously declared that "the underlying test of admissibility of statements, admissions or confessions is still voluntariness. The requirements of Miranda are a means to this end." State v. Zachmeier, 151 Mont. 256, 441 P.2d 737. In determining whether a statement by a defendant is voluntary, the "totality of the circumstances" surrounding the securing of the statement is controlling. Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77; Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423.

With these federal constitutional principles in mind, we direct our attention to the instant case. It is abundantly clear that the required Miranda warnings were given to defendant prior to any questioning by law enforcement officers. Deputy Bromgard's testimony, which was uncontradicted by defendant, indicated that he told defendant in her cell that he wanted

to question her, that she didn't have to make any statement, that she could have an attorney present before making any statement, that any statement she might make "may be used for or against her" in court, that if she didn't have an attorney "one would be provided for her by the Court," and that she could stop answering questions at any time. Thereafter defendant told him she would go with him and make a statement.

She accompanied him to the interrogation room where he read to her the printed paragraphs on the statement form advising her of her constitutional rights as follows:

### "VOLUNTARY STATEMENT

"Before was ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. You have this same right to the advice and presence of a lawyer, even if you cannot afford to hire one. We cannot ourselves furnish you a lawyer, but one will be appointed for you, if you wish, when you go to court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer."

It is hard to imagine how a more complete warning as to her constitutional rights could have been given the defendant.

It is equally clear that defendant expressly waived her constitutional right to the assistance of counsel prior to and during interrogation and her constitutional right against self-incrimination. She agreed to accompany Deputy Bromgard to the interrogation room for questioning, did so, said she understood her constitutional rights after being advised of them, and signed a written waiver prior to any questioning. This written waiver is contained in the printed matter at the top of the statement form immediately after the warning on constitutional rights and reads as follows:

## "WAIVER

"I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me."

The crux of the matter is whether her waiver was given voluntarily, knowingly, intelligently and as a consequence constituted a valid waiver rendering her statement admissible. Broadly speaking, defendant contends that the waiver is invalid because (1) she wasn't advised of the charge against her, and (2) her mental condition was such that she was incapable of understanding her constitutional rights or waiving them.

We find no merit in defendant's claim that her waiver is invalid because she was not advised of the charge against her prior to questioning. Deputy Bromgard advised her at the time he took her in custody that she was being arrested for "an assault on her husband." He and Betty Weeks, the jail matron, advised her in her cell that her husband was dead and they wanted to talk to her "concerning her husband." It is clear that they did not use the word "murder" or advise her of the statutory punishment for murder upon conviction. But it is equally clear from her statement that she knew she was a suspect in the stabbing death of her husband—"I didn't cut or kill my husband. I swear I didn't." We are not aware of any requirement that an in custody suspect, prior to interrogation by law enforcement officers, must be advised with technical precision of a charge not then filed and the penalty upon conviction. We hold that under the circumstances of the instant case defendant was adequately advised as to why she was being held, why she was being questioned, and was aware of these matters including the gravity thereof.

Defendant next argues that her waiver of constitutional rights is invalid because her mental condition at the time

of waiver was such that she did not understand her constitutional rights and was incapable of waiving them. This is bottomed on her claim (1) that she was mentally dazed due to intoxication and the shock of her husband's death, and (2) that she was unable to read, understand or communicate satisfactorily in the English language.

Let us review the evidence. Deputy Bromgard testified that at the time he observed defendant at her home upon his arrival there at about 12:05 a.m. he could "smell liquor on her" and he knew "she was under the influence of alcohol;" she wasn't "dead drunk" but she was "under the influence." When she spoke, "there was no slurring of words." At that time defendant appeared to be excited, dazed and "didn't seem to be aware of the happenings." Deputy Proffer, who observed defendant at approximately the same time, testified that he formed the impression she had been drinking and seemed to be pretty well intoxicated. Betty Weeks, the matron at the jail, testified that she "wouldn't say that she [defendant] was drunk but she had been drinking" and that she "could smell the intoxicating liquors on her breath." (Bracketed word added.)

Defendant, in her statement, said that at the time she was told to come to the deputy's car and come to the jail, she'd just had a few drinks and wasn't drunk. At the trial defendant testified to drinking an undetermined amount of liquor all day and into the evening in question. She said she hadn't eaten lunch and didn't remember eating anything all day.

When Deputy Bromgard and Betty Weeks went to defendant's jail cell prior to taking her statement, they awakened her with some difficulty and told her that her husband was dead. Defendant threw herself back on the bed, seemed to be in shock, and appeared dazed. In "a minute or minute and a half," defendant regained her composure. After this, Deputy Bromgard told her they wanted to question her concerning her husband, defendant accompanied them out of the cell, through

three doors and around the corner to the interrogation room some 60 feet away. Both Deputy Bromgard and Betty Weeks testified that defendant had regained her composure prior to the warnings on constitutional rights and questioning.

Defendant in her testimony at the trial testified that she doesn't remember being given the constitutional warnings, waiving her constitutional rights, or the questioning and statement. She testified that she was subject to "blackouts," doesn't know what the word "statement" means, and didn't understand the meaning of the warning on constitutional rights printed at the top of the statement form.

While the burden of proof is on the prosecution to prove a valid waiver of the constitutional right against self-incrimination, the presumption is that the trial court ruled correctly. There is no direct evidence that defendant was intoxicated at the time the constitutional warnings were given, the waiver was signed, the questioning was done, and the statement was signed. There is only an inference that she was "under the influence" from her previous condition. In the intervening time of at least two hours, defendant had walked around, taken a shower, had some sleep, but had nothing to eat. As to being dazed, the only direct evidence is that she had fully recovered her composure after being advised of her husband's death against defendant's testimony that she was upset during questioning and doesn't know what she did say. Regarding her inability to read, understand, and communicate in the English language there is her testimony to the effect that she couldn't very well. The record at the trial demonstrates she had no difficulty in responding to the questions of the attorneys, not in the King's English, perhaps, but knowingly and understandingly. She was able to read Deputy Bromgard's handwriting on the statement and to interpret "qt. of whiskey" as "quart of whiskey."

Additionally, it must be observed that much of her claim of invalid waiver is bottomed on her own unsupported testi-

mony. Her testimony is subject to question as to credibility and weight. The trial judge, who had the opportunity to observe the appearance and demeanor of defendant on the witness stand, her manner of testifying, and her apparent candor or want of candor, in addition to hearing the testimony itself, is in a superior position to ours in determining her credibility as a witness and the weight to be given her testimony.

But perhaps the most telling proof against defendant's claim of invalid waiver is the contents of the statement itself. In that statement defendant denies categorically that she stabbed her husband, provides herself with an alibi by placing herself in an outside privy away from the scene of the stabbing, and diverts suspicion away from herself and onto Patrick Little Boy by placing him in the house with her husband when she left to go to the privy and missing from the house upon her return. While we are mindful that constitutional standards as to waiver apply as equally to exculpatory statements as to inculpatory ones (Miranda v. State of Arizona, supra), defendant's statement here demonstrates more clearly than a thousand self-serving words uttered at the trial that her mental faculties were operating in high gear at the time of the interrogation.

For the foregoing reasons, we hold that there is substantial credible evidence sustaining the State's heavy burden of proof of a valid waiver of defendant's constitutional rights (1) to assistance of counsel during interrogation and (2) against self-incrimination. In so doing we specifically sustain Judge Fenton's determination that such waiver was given voluntarily, knowingly, and intelligently.

The second issue assigned by defendant for review is that of permitting Deputy Bromgard, then on the witness stand, to read the entire statement of defendant, including the warning on constitutional rights and waiver, to the jury in the same manner he read it to defendant prior to her signing. The manner in which the statement was read to defendant by

Deputy Bromgard is material in determining whether the contents of the statement were understandable to defendant prior to her signing it. It is also material as evidence that his constitutional warnings and waiver were enunciated clearly and understandably to defendant. The statement may be read to the jury after its admission in evidence. Section 93-1901-14, R.C.M.1947; Section 94-7209, R.C.M.1947. Defendant's contention is without merit.

The third issue for review is the refusal of the trial court to strike the testimony of witness Thomas F. Kelleher, Jr. He was a special agent of the FBI employed as a forensic serologist. The substance of his testimony was that he found human blood of International Blood Grouping A on various articles found at the scene of the crime, including a knife and clothing worn by the deceased and defendant.

Defendant contends that this evidence should have been stricken because it did not tend to prove or disprove any issue in the case and it was highly prejudicial because juries tend to believe testimony of FBI agents and consider their testimony important. Defendant's contention cannot be sustained. It did have probative value to the extend of showing human blood on the clothing of both defendant and the deceased. The evidence came in without a single objection on direct examination, redirect examination, and additional redirect. Evidence admitted without objection is not subject to a motion to strike. State v. Fisher, 54 Mont. 211, 169 P. 282; State v. Van, 44 Mont. 374, 120 P. 479; State v. De Hart, 38 Mont. 211, 99 P. 438. Additionally, the motion was untimely in that it was not made until the day following the testimony after the witness had been excused.

The final issue for review involves 5 jury instructions, 2 of which were given and 3 of which were refused. We have examined and considered these instructions finding that the court committed no error in its rulings thereon. We do not consider that these rulings require discussion herein.

We have examined all other contentions of defendant in her brief and oral argument and find them to be unmeritorious. The judgment of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES CASTLES and ADAIR, concur.

MR. JUSTICE JOHN CONWAY HARRISON, (dissenting).

I dissent.

To take a statement from an obviously drunk, confused and semi-literate woman of Mexican descent who had been arrested several hours before and allowed two hours of sleep and awakened and told of her widowhood violates, to say the least, the spirit if not the substances of *Miranda.*

As I read *Miranda* it holds that the mere "fact of custody" is inherently "compulsive" in its Fifth Amendment sense; that as soon as a person is deprived of his or her "freedom of action" adversary proceedings begin and the privilege protects her from questioning, routine or otherwise, which seeks to elicit a criminal or clue fact.