No. 81-227

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

MICHAEL CHARLES DUPRE,

Defendant and Appellant.

Appeal from: District Court of the Fourth Judicial District,
In and for the County of Missoula
Honorable James B. Wheelis, Judge presiding.

Counsel of Record:

For Appellant:

Anthony F. Keast argued, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Robert L. Deschamps III, County Attorney, argued,
Missoula, Montana

Submitted: June 22, 1982

Decided: September 3, 1982

Filed: SEP - 3 1982

*Thomas J. Kearney*
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant Michael Dupre was convicted of one count of deliberate homicide and three counts of attempted deliberate homicide by a jury in the Missoula County District Court. From these convictions, Dupre appeals.

In the early afternoon of July 8, 1980, Michael Dupre secreted a .22 caliber semi-automatic pistol in some weeds in the downtown Missoula alley that runs behind Connie's Bar. That evening Dupre began visiting Missoula taverns. He was dressed in Levi's, a short-sleeved shirt unbuttoned to the waist, and thongs, and was wearing several turquoise necklaces and bracelets and numerous rings. He wore the jewelry, some his and some his mother's, in an attempt to find buyers for it in the bars.

After confronting one patron of Connie's by flashing the rings under the man's nose, Dupre was told to "hit the road" and the man asked if Dupre would like to be taken outside to have the rings removed. Dupre left Connie's without responding, retrieved the pistol, placed it behind his belt buckle, and went to several other bars before returning to Connie's. He then reapproached the man in Connie's, asking "Where the hell you been? I've been waiting outside for half an hour." Dupre was again told to leave the patron alone and to "hit the road."

During the time between picking up the pistol and returning to Connie's, Dupre had the first of three encounters with a group of young people in front of Larken's Furniture store, which faces Higgins Avenue and sits on the alley that runs behind Connie's. On each occasion, the members of the group made remarks and gestures indicating

that they thought Dupre was a homosexual. Dupre responded each time by cussing at the individuals (at least once calling them punks), and by inviting them to fight.

After his second run-in with the group, Dupre again returned to Connie's Bar, removed his jewelry, and placed it in a sack with his name on it. He left it in the bartender's care.

Dupre's final encounter with the group began with a verbal exchange which developed into a physical confrontation when he once more invited them to fight. This exchange was primarily between Dupre and Rick Mikesell. Dupre entered the alley followed by Rick and Lyle Mikesell, Bob Gerstenberger, and, some distance behind, Gary Williams. Two other youths began to get out of a nearby car to watch the fight to be held between Dupre and Rick Mikesell. As the Mikesell group rounded the corner into the alley, someone noticed Dupre pulling something from his shirt. Fearing a knife, Rick Mikesell broke a beer bottle to use for his own weapon. Dupre was a substantial distance from the group when he turned, removed the gun from his shirt, aimed it, and without warning emptied it into the group consisting of the two Mikesells, Gerstenberger and Williams. As he fired, the group turned and ran around the corner of Larken's to the sidewalk. Dupre proceeded down the alley, turned past the Missoula City Police station, and eventually went home.

The following day, Dupre called Connie's Bar and asked the bartender to call a taxi and to have it deliver the sack of jewelry to his mother's home, where he was staying. Missoula police officers investigating the shooting incident had determined that a man fitting the

general description of the individual involved in the shooting had left jewelry at Connie's the night of July 8 and had asked to be informed of any attempt to claim it. The bartender notified the police of Dupre's request, and two detectives were dispatched to the address that had been given to the bartender. When they arrived and identified themselves, the detectives asked Dupre if he had called about the jewelry. He answered that he had, and the officers asked him to accompany them to police headquarters to identify the jewelry.

When they arrived at the station, the officers explained that the person who had left the jewelry at Connie's matched the general description of the person involved in the shooting the night before and that they would like to talk to him about the shooting. They then asked him if he knew anything about the shooting. He answered, "Yes." At that point, Dupre was read his Miranda rights (Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694), they were fully explained to him, and he said that he wanted to talk to the detectives. He then signed a written waiver. He initially wrote "No" in the blank that asked if he wanted to talk to the detectives. When one of the officers pointed out that the "No" meant that he did not want to make a statement, he indicated that he had made a mistake, changed his answer to "Yes," and initialed the change. After making a statement to the detectives, he then repeated his statement in greater detail in order to make a tape recording. Full Miranda warnings were again given and explained in detail, and Dupre again waived those rights. The taped statement was admitted into evidence without

objection as Plaintiff's Exhibit No. 8.

Bob Gerstenberger was struck by a bullet which entered his chest cavity under his right armpit and lodged just under the skin on his left side. He died from the resulting injuries on July 10, 1980. Rick Mikesell was hit with two bullets, one entering and exiting the top of the back of his right shoulder. The other entered the top of his shoulder near his neckline, traveled three or four inches, and lodged at the base of his skull, where it remains. Mikesell recovered from his injuries. Dupre's convictions followed.

On appeal, defendant claims he was denied effective assistance of counsel in the following respects: (1) failure of counsel to protect his privilege against self-incrimination; (2) failure of counsel to adequately cross-examine an expert witness, Dr. Henneford; and (3) failure of counsel to object to improper and prejudicial statements by the prosecutor in closing argument.

The standard that this Court uses to determine whether a defendant received effective assistance of counsel was set forth in State v. Rose (1980), ___ Mont. ____, 608 P.2d 1074, 37 St.Rep. 642:

> "The new test is known as the 'reasonably effective assistance' test and may be stated as follows:
>
> "Persons accused of crime are entitled to the reasonable assistance of counsel acting within the range of competence demanded of attorneys in criminal cases." 608 P.2d at 1080-1081, 37 St.Rep. at 649-650.

An examination of the record reveals that Dupre's public defender, an experienced criminal attorney, diligently pursued the theory of self-defense which Dupre again

asserts on appeal. Counsel filed numerous pretrial motions, including: a motion for substitution of judge; notices of both the defenses of inability to form the requisite mental state and of self-defense; motions for production of witnesses, rebuttal witnesses, and evidence; motions to request a psychiatric evaluation and to request the services of an independent investigator; and a motion in limine to exclude testimony that would tend to connect Dupre with other crimes, whether charged or not. Finally, defense counsel called five witnesses, including the defendant, to testify on Dupre's behalf. We will consider in turn each alleged error on the part of defense counsel which Dupre raises.

Dupre raises as a first issue that he was denied his constitutional right against self-incrimination because his Miranda rights were not voluntarily and intelligently waived and that his counsel's failure to challenge the admissibility of his statement thus constitutes ineffective assistance of counsel. He specifies three reasons that his statement was not voluntarily and intelligently given. He argues, first, that his Miranda warnings were given after he had already made an admission against interest that amounted to a confession; second, that the "No" marked on the written waiver of his Miranda rights that was then changed to a "Yes" demonstrates confusion on his part that supports a theory of trickery or cajolery by the police; and, finally, he argues that he could not knowingly and intelligently waive his Miranda rights when at the time his statement was made he was without actual knowledge that anyone was injured in the shooting.

Dupre contends that at the point Detectives Weaver and Lewis arrived at his mother's home and learned that he claimed ownership of the jewelry and that he fit the general description of the shooting suspect, he became the focus of the investigation and should have then been given Miranda warnings. He maintains that his "Yes" answer to the question of whether he knew anything about the shooting incident is an admission against interest made pursuant to an unconstitutional interrogation and that it amounts to a confession.

A custodial interrogation situation requiring Miranda warnings is not created simply because an individual is the focus of an investigation. Beckwith v. United States (1976), 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1. Nor are Miranda warnings necessary simply because the questioning takes place at the station house when there is no indication that the questioning took place in a context where freedom to depart was in any way restricted. Oregon v. Mathiason (1977), 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714.

We have held that the test of admissibility is whether the waiver was voluntarily and intelligently given in the light of all circumstances, considering such pertinent factors as "the age of the accused, his education, his knowledge of the nature of his Fifth Amendment rights, his mental capacity, his previous experience with the criminal justice system, and his experience in the adult world." State v. Blakney (1982), ___ Mont. ___, 641 P.2d 1045, 1050, 39 St.Rep. 436, 441.

Defendant was twenty-four years old at the time he made his statement, had a ninth grade education, had

received his G.E.D., and had completed a Utah Job Corps carpentry program. The taped waiver of his Miranda rights demonstrates a clear understanding of the nature of Fifth Amendment rights and what he was waiving, and there is absolutely no indication that his mental capacity is such that it would invalidate his waiver. He has had previous contact with the criminal justice system, having been convicted of a theft charge in Arizona and having served eleven months on that conviction. He has lived in California, Washington, Germany, Arizona and Montana and has earned his livelihood by working at carpentry, bricklaying, oilrigging and fishing.

The facts of this case relating to defendant's statement closely parallel the situation we examined in State v. Graves (1981), ___ Mont. ___, 622 P.2d 203, 38 St.Rep. 9. In Graves, a black suspect began walking down Airport Road from Mr. Lucky's lounge in Helena after a stabbing at the bar. Within minutes of the incident, a black man was approached on Airport Road by investigating officers and was asked if he was involved in the altercation and if a knife was involved. He answered "Yes" to both questions and turned the knife over to the patrolman, who then noticed blood on the suspect's hands, placed him under arrest, and gave him Miranda warnings. Here, as in Graves, the suspect had not been deprived of his freedom in any significant manner at the point at which the statement was made.

In any event, defendant's affirmation of knowledge of the shooting does not amount to a "confession," which this Court has defined in the following manner:

> "A 'confession' in a legal sense is restrict-
> ed to an acknowledgement of guilt, made by a

person after an offense has been committed, and does not apply to a mere statement or declaration of an independent fact from which such guilt may be inferred. (Citation omitted.)" State v. Stevens (1921), 60 Mont. 390, 402, 199 P. 256, 259.

Dupre's statement was not even an independent fact from which guilt may have been inferred. Dupre did not make an admission that he had been involved in the shooting until after his Miranda rights were waived. The simple affirmation of knowledge of the incident might easily have been based upon the news reports which had been published and broadcast after the altercation. Nor had the focus of the investigation yet begun to shift to Dupre before he gave that response. State v. Lucero (1968), 151 Mont. 531, 537, 445 P.2d 731, 734. While he did fit the general description of the suspect, that description was very general: "average height of about five ten or so; medium build; mustache and hair length down to the ears, and a light shirt unbuttoned to the middle of the chest." Miranda warnings were clearly not required prior to his statement that he did know something about the shooting.

Neither does the record support a finding that the waiver was the result of trickery or cajolery as evidenced by the change of the "No" to "Yes." Dupre signed the waiver and made the first statement within minutes of arriving at the station. The lapse of time between the original statement of rights and the tape recording is only fourteen minutes. Both Dupre and Detective Weaver testified that the defendant gave a statement to the officers during that period and that he then agreed to give a more detailed statement on tape. The taped statement and defendant's testimony both indicate that he definitely wanted to talk to

the detectives and that he voluntarily and intelligently waived his right to have counsel present while he did so.

Defendant's contention that his waiver could not be voluntarily and intelligently waived if he was not aware of the injuries that resulted from the incident is without merit. He cites no authority for this proposition. The printed "Advice of Rights" which Dupre signed and waived plainly indicated that "[a]nything [he] [said] [could] and [would] be used against [him]." (Emphasis added.) To preclude the prosecution from using statements that were clearly given voluntarily based upon a theory that the defendant should be told of details of the crime and of all potential crimes that could be charged would hamstring police investigations where unexpected information is often provided that sheds light on other offenses. Finally, this Court has previously addressed and soundly rejected this argument. Lucero, supra, 151 Mont. at 540, 445 P.2d at 736. Our stand has not changed.

Counsel's failure to object to admission of the statement did not constitute ineffective assistance of counsel. In fact, the statement provided a consistent reinforcement of Dupre's claim of self-defense.

The second major issue raised by Dupre is that he was denied effective assistance of counsel by his public defender's failure to cross-examine expert witness Dr. J. R. Henneford, the pathologist, regarding the possible presence of ricochet marks on the bullet removed from the deceased's body. He contends that this resulted in a material lack of evidence available to the jury that could have provided an alternate explanation for the location of the parties'

-10-

injuries. However, defendant does not even argue that such evidence was available.

The State notes that the bullet is still in police custody and that it is presumable that defense counsel examined it prior to trial. In light of defense counsel's vigorous attempt to develop the theory that Dupre was shooting at the ground and that the bullets ricocheted into the victims, it is probable that had such evidence been available, defense counsel would have utilized it.

Defense counsel cross-examined the individuals who were in the alley during the shooting to elicit testimony of sparks and ricocheting sounds. Additionally, defense counsel presented testimony of a gun expert that seemed designed to support the theory that the gun was fired at the ground and that the bullets ricocheted and, alternately, that the gun's recoil may have been a factor in causing the shots to hit higher. Finally, Dupre was appointed an experienced independent investigator who was allowed to examine all of the physical evidence. Defendant is engaging in wild speculation. This argument, too, is without merit.

The final issue raised by Dupre is that he was denied effective assistance of counsel by the public defender's failure to object to improper argument by the prosecutor. It is too late on appeal to raise objection to argument by the prosecution when no objection was raised below. Hawkins v. Crist (1978), 178 Mont. 206, 210, 583 P.2d 396, 398, cert. denied, 439 U.S. 957, 99 S.Ct. 359, 58 L.Ed.2d 350. We consider this argument only because it forms a basis for a finding of ineffective assistance of counsel. This Court requires, however, that in a criminal case, if prejudice is

-11-

alleged, it will not be presumed, but it must be established from the record that a substantial right was denied. State v. Watkins (1971), 156 Mont. 456, 464, 481 P.2d 689, 693.

Here, defendant characterizes three arguments in the prosecution's closing as prejudicial: first, that the prosecuting attorney drew improper and conclusory inferences unsupported by facts presented to the jury; second, that remarks made by the prosecutor in closing argument in reference to the defendant were self-opinionated, demeaning and condoned a derogatory attitude toward Dupre; and, finally, Dupre contends that the prosecutor's closing remarks confused the jury as to the "reasonable man" standard of self-defense.

> We have recognized that:
>
> "'Generally, the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles involved, to be presented in instructions to the jury, are all matters within the proper scope of argument . . .' (Citations omitted.)" State v. Thompson (1978), 176 Mont. 150, 157, 576 P.2d 1105, 1109.

See also, State v. Musgrove (1978), 178 Mont. 162, 582 P.2d 1246. Dupre's objection to improper and conclusory inferences is based upon statements by the prosecutor that the two parties who were wounded were attempting to flee from the alley. The evidence introduced by the prosecution substantially supports these inferences. Rick Mikesell was shot in the back and Gerstenberger was shot sideways through the chest with no injury to either arm. His right arm must have been raised when the bullet entered and he was sideways to the line of fire. Additionally, Lyle Mikesell testified that he turned and ran when the shooting started, and Gary

Williams testified that after freezing for a moment he, too, turned and fled. The prosecutor's comments were proper.

Defendant next argues that the prosecutor's comments as he described defendant's appearance, and the average person's possible reaction to it, condoned a prejudicial and discriminatory community attitude toward defendant that implied that harassment of him was proper.

Comments by the prosecutor that indicated an understanding of how someone might think that Dupre was a "little strange" based upon his appearance were consistently preceded and interspersed by emphatic condemnations of the group's harassment of Dupre. Counsel repeatedly stated that he could not condone or justify their actions and that "to a certain extent they deserved getting tromped on." Defendant has not demonstrated substantial prejudice.

Finally, we are not convinced that the prosecutor's closing remarks, which asked the jury whether a reasonable person would continue to provoke verbal exchanges and harassment by returning to the corner repeatedly, confused the jury as to the reasonable man standard of self-defense.

While the use of the term "reasonable man" could cause confusion when it is used in a different context than as the self-defense standard, no likelihood of confusion based upon use of the words has been demonstrated. Here, Jury Instruction Nos. 20, 21 and 26 precisely set out the statutory self-defense standard. Sections 45-3-101, -102 and -105, MCA. Additionally, both defense counsel and the prosecutor explained the self-defense instructions and gave examples of the extent of force permissible to use in standing one's ground in given situations. And, they

-13-

explained that an aggressor has the duty, if possible, to withdraw or escape before the use of force that is likely to cause death or serious bodily injury.

The thrust of the prosecutor's comments goes to a determination of whether Dupre, rather than one or more of the group members, was the aggressor in the altercation. They do not amount to prejudicial error.

Defendant was not denied effective assistance of counsel.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

_____
Justices

-14-