THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT v.
EARL H. WARRICK, DEFENDANT AND APPELLANT.

No. 11478.
Submitted Sept. 10, 1968.
Decided Nov. 12, 1968.
Rehearing Denied Nov. 27, 1968.
446 P.2d. 916.

Robert Skelton, argued, Missoula, James Cunningham, argued, Thompson falls, for appellant.

Forrest H. Anderson, Atty. Gen., William A. McCormick, Asst. Atty. Gen., argued, Helena, Alex C. Morrison, County Atty., argued, Thompson Falls, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

The appellant, Earl W. Warrick, was charged by information with the crime of assault in the second degree; was convicted and sentenced to six years in the state penitentiary with all but two years suspended.

The events out of which this prosecution arose occurred October 31, 1967 in the community of Trout Creek, Montana, where appellant and his wife, Lou Anna, resided. At that time appellant's brothers, Sherman and Benjamin Warrick, accompanied by one Fats Westerman, had come out from Illinois for the hunting and were staying in a small trailer parked on appellant's property. Appellant and his wife also lived on this property in a trailer some 69 feet from the bank of the Clark Fork River.

Since construction of the Noxon Rapids Dam this area of

the river is a part of the dam impoundment, and the river bank at this point is high, steep, and rough. The bank is actually about 30 feet high and part of it is too steep to walk on.

The afternoon of October 31st was spent by appellant and Lou Anna helping a Mrs. Sutton, who had recently sold the Wayside Bar in Trout Creek to another party, move her belongings from the bar into a trailer. Appellant drank some beer and had at least one "boiler maker". Mrs. Warrick had a beer or two in the bar. The appellant and Lou Anna were still in the bar at approximately 6:00 p.m. when the brothers returned from the hunting trip. The evening was spent drinking with various persons in the bar.

The brothers left the bar first, shortly before 10:00 p.m. Mrs. Mary Miller watched the appellant's brothers and their friend head in the direction of Thompson Falls until their vehicle went out of sight. They had stated that they were going home to Illinois. Before they left they had quarreled with the appellant. There was also testimony that appellant kicked the stool out from under Lou Anna and she fell to the floor. Appellant was described as "ornery" and "picking" at everyone.

Ten or fifteen minutes after the brothers left, the appellant picked Lou Anna up, put her over his shoulder and started to leave. Lou Anna grabbed the door jamb and both fell in a heap on the doorstep just outside the bar. Appellant then picked his wife up and threw her in their pickup. Appellant was seen moving his hands around in the pickup before they drove to their trailer some fifteen or twenty minutes later.

About midnight the appellant knocked on Wayne Welch's door, who lived about 1,000 feet east of the Warricks, asked for help, and ran away. Mr. Welch stopped at the Warrick trailer first but he could not find anyone and summoned the help of one Mr. Eaton. Together they returned to the Warrick trailer and located the appellant and Lou Anna by the river bank. These men assisted the appellant in lifting and carrying Lou Anna up and over the bank into the trailer. They testified that

they did not drag or bump her in any manner. She was unclothed and unconscious.

Mr. Eaton called the sheriff and Dr. Rosedahl of Thompson Falls who arrived at the trailer about 12:45 a.m. The doctor conducted a perfunctory examination, confined to the face and head, checking for a possible drowning. He concluded that Mrs. Warrick was anesthetized by alcohol, her pupils were dilated, but her breathing and color were good. The appellant told the sheriff at this time that he believed his brothers and Westerman had given Lou Anna a "mickey" and had attempted to molest her; that when the appellant drove up to the trailer, Lou Anna ran over the bank and into the river, where he followed her and eventually rescued her. Appellant then demanded that the sheriff stop the brothers' vehicle.

At 2:20 a.m. the sheriff's office received a call that an ambulance was needed and Clinton Spindler's ambulance was summoned from Plains. Mr. Spindler testified that Lou Anna had what appeared to be beating marks on her. The appellant told Spindler that his wife had been picked up by three fellows in a pickup with Illinois license plates, driven to a cliff and thrown over the cliff into the water. The ambulance transported Mrs. Warrick to Bonner General Hospital in Sandpoint, Idaho, arriving there about 3:30 or 4:00 a.m. although there is confusion about the exact time.

Dr. Charles Smick examined her upon arrival and found her to be wet, cold, nude and unconscious with extensive bruises, scratches and abrasions about the head and other parts of the body. Appellant told the doctor he didn't know how the injuries occurred and he felt that maybe his brothers had something to do with it. He also told the doctor he had gotten her out of the water and had some recollection that she had been in the water for some time.

At the trial Dr. Smick testified that "she (Mrs. Warrick) has a scrambled brain syndrome and is just a vegetable. * * * in order to have this, you must have multiple injuries to the

brain tissue itself. \* \* \* this \* \* \* can happen when people have had repeated blows to the head, either side of the head, and sort of a bouncing back and forth of the brain." His opinion after viewing the place on the river was that she was dragged from the trailer down to the beach and felt her back could not have been abrased the way it was by rolling in.

Dr. Smick testified there were abrasive wounds on her entire back with a considerable amount of skin removed. In the doctor's opinion she had been dragged where her back lay in a flat position some length on more of an even surface; he was referring to the rough bank. The doctor further testified that if Mrs. Warrick had fallen off the bank that there would be "evidently ample skull fracture" and the X-rays disclosed no such evidence of a skull fracture.

Our foregoing description of the bizarre happenings on a Halloween night in the small rural community of Trout Creek is pieced together from various witnesses to the preliminary drinking bout in the "Wayside Bar". The subsequent events are equally bizarre. The appellant, the prime actor, gave various conflicting stories at the immediate times, at one time trying to get the sheriff to arrest his own brothers. With his wife in an unconscious beaten state, the appellant returned to the bar for help but, according to his own version, took time for one more beer.

The appellant in his testimony to the jury stated that he had no recollection of any thing that transpired prior to midnight. The first thing he did remember was Lou Anna standing unclothed on the river bank and he was in his pickup with the lights on. He then "hollered" at her and she went over the bank. He had no recollection of anyone else being there. He slid down the bank behind her and got her out of the water.

Mrs. Warrick was later transferred to Sacred Heart Hospital in Spokane, and is now in a home in that city being cared for by her mother. There is little or no hope that she will ever regain consciousness.

Appellant divides the alleged errors on this appeal into four parts. We shall discuss them in the same manner. These parts are: (1) verdict contrary to law and evidence, (2) error in admitting certain photographs, (3) error in jury instructions, and (4) error in denial of pre-trial motions.

The State's case rested upon circumstantial evidence on whether a crime was in fact committed; and if so, whether the appellant committed it. The rule in Montana is that to justify a conviction on circumstantial evidence, the facts and circumstances must not only be entirely consistent with the theory of guilt, but must be inconsistent with any other rational theory. State v. Stoddard, 147 Mont. 402, 412 P.2d 827. In a circumstantial evidence case all of the facts and circumstances must be taken into consideration collectively. State v. DeTonancour et al., 112 Mont. 94, 112 P.2d 1065. The credibility of the witnesses is a question for the jury. State v. Semmens, 105 Mont. 113, 71 P.2d 913. The facts of this case set forth in the record support the conviction. The jury was free to discredit the appellant's testimony in whole or in part. State v. Semmens, supra. Having done this, the jury was also free to discredit the testimony of Dr. Buchanan (the appellant's pathologist) whose testimony was based on the appellant's description of what happened. Dr. Buchanan, who neither saw nor examined Mrs. Warrick, testified that her injuries could have resulted from falling down the bank and being rescued in the manner described. The appellant, Dr. Buchanan and Mr. Eggensperger, who took photographs of the river bank in that locale, were the only witnesses called on behalf of the defense.

The trial court admitted into evidence State's exhibits 3 and 5, which were colored photographs of Mrs. Warrick taken shortly after her admission to the hospital. Appellant urges that it was error to admit these pictures because they were technically defective in matters of coloration and permitted Dr. Smick to state that Mrs. Warrick's injuries were actually worse than

depicted in the exhibits, thus permitting the jury to speculate on the actual injuries. This Court held in State v. Rollins, 149 Mont. 481, 428 P.2d 462, that color photographs that have probative value are admissible. The case of State v. Bischert, 131 Mont. 152, 308 P.2d 969, relied on by appellant, is not in point. In that case the photographs did not support the State's theory that the child was starved to death but tended to support a collateral issue not in the case, i. e. that the parents failed to provide medical attention. The photographs showed "ghastly and gruesome" looking sores that in no way went to the proof of starvation.

██ In this case the photograhps showed the injuries occasioned by the alleged assault. There is nothing in these photos that would inflame the minds of the jury and prejudice the appellant. They support the issue in the case and were identified by the highway patrolman and the attending physician and were properly admitted.

Appellant alleges error in jury instructions in his third argument. He contends that the court's instruction No. 5 is incomplete. Instruction No. 5 reads as follows: "You are further instructed that no act committed by a person while in a state of voluntary intoxication is less criminal by his being in said condition." Appellant objected to this instruction on the grounds that since wilfulness and intent are elements of the crime charged, the jury should be instructed that if the appellant's intoxication was to such a degree as to remove or diminish his capacity for wilfulness and intent then they could take this into account in arriving at their verdict.

The trial court refused appellant's offered instruction No. 1, which is as follows:

"Our law provides that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree

of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.''

█ This is in fact the first two sentences of section 94-119, R.C.M.1947. Since wilfulness is not mentioned in this section, the court's instruction No. 5 was not improper as to the element of wilfulness. Therefore intoxication under section 94-119, R.C.M.1947, does not concern wilfulness.

The question remaining is whether or not there is the existence of any particular intent as an element of second degree assault. Second degree assault is defined for the purpose of this case under section 94-602, R.C.M.1947, as follows: ''Every person who * * * (3) Wilfully or wrongfully wounds or inflicts grievous bodily harm upon another * * * is guilty of an assault in the second degree * * *.''

█ In State v. Fitzpatrick, 149 Mont. 400, 427 P.2d 300, this Court recently said, quoting from State v. Straight, 136 Mont. 255, 347 P.2d 482, ''As we have heretofore mentioned, subdivisions 3 and 4 of section 94-602, do not specifically require intent in order to constitute an assault. * * * Under the above assault section the prosecution is only required to prove that the assault was committed wilfully, wrongfully, and unlawfully.'' Since specific intent is not an element of second degree assault in this case the court was correct in refusing appellant's offered instruction No. 1.

█ █ The appellant predicates as error the failure of the court to give his offered instruction No. 5 which stated in part: ''An essential element of the crime of which the Defendant is accused is intent, the law requiring that to constitute such a crime there must exist a union or joint operation of criminal conduct and criminal intent * * *.'' This offered instruction is based in part upon section 94-117, R.C.M.1947, which states that in order to constitute a crime, there must exist a union or joint operation of act and intent. This section does not require proof of specific intent in order to justify a conviction

if the specific intent is not an ingredient of the statutory offense. Since specific intent is not a necessary element under subdivisions 3 and 4 of section 94-602, R.C.M.1947, the court could properly refuse this instruction.

Appellant's offered instruction No. 6 was in effect a directed verdict of acquittal. For the reasons above stated dealing with the sufficiency of the evidence to support the verdict, the refusal to give this instruction was proper.

█ █ In his fourth argument appellant contends that his motion for change of venue ought to have been granted. The affidavits in support of appellant's motion for a change of venue merely recite the opinions of the people subscribed thereon. The affidavits are identical copies of each other and do not differ in any material respect. This type of affidavit was found lacking in the cases of State v. Bischert, supra, and State v. Spotted Hawk, 22 Mont. 33, 55 P.1026. An application for a change of the place of trial is addressed to the sound discretion of the trial court and unless a clear abuse of discretion is shown the ruling of the trial court will not be disturbed. State v. Hoffman, 94 Mont. 573, 23 P.2d 972; State v. Bischert, supra.

The case was submitted to the jury on the theory of circumstantial evidence and the jury found against the defendant-appellant. Since the evidence supports the findings of the jury and we can find no error in the record, the judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES HASWELL, ADAIR and JOHN C. HARRISON, concur.