No. 13111

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

LOREN DUANE SHARBONO,

Defendant and Appellant.

---

Appeal from: District Court of the Seventh Judicial District,
Honorable L. C. Gulbrandson, Judge presiding.

Counsel of Record:

For Appellant:

Moses, Kampfe, Tolliver and Wright, Billings,
Montana
Charles F. Moses argued, Billings, Montana

For Respondent:

Hon. Michael Greely, Attorney General, Helena,
Montana
Victor G. Koch argued, County Attorney, Sidney,
Montana

---

Submitted: January 24, 1977

Decided: MAR 31 1977

Filed: MAR 31 '977

_Thomas J. Kearney_
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Defendant appeals from a jury conviction of deliberate homicide entered in the district court, Richland County. Defendant was sentenced to 75 years in the Montana State Prison.

Defendant Loren Sharbono was an independent oil field service worker whose job took him away from home. He resided with his wife Ellen Sharbono and their 12 year old son in Baker, Montana. At the time of her death Ellen was eight months pregnant.

On November 15, 1974, defendant picked up his son in Baker and took him to stay in Glendive, Montana. Defendant was to return on November 16, 1974, to pick up Ellen and go to Sidney, Montana or to Dickinson, North Dakota, for the weekend to talk over some domestic problems. Testimony of witnesses indicated Ellen was afraid of night driving and was not going unless defendant came for her. Defendant denied this, but testified she did have poor eyesight and wore thick lens glasses.

Defendant had been going with a Sidney girl, Janis Hams, for two years and this was known by Ellen. According to testimony of Janis, they were contemplating marriage. Thirty days before Ellen's death a December 6, 1974 marriage date was set. Defendant told Janis his divorce would be final November 23, 1974, although he refused to name his attorney and asked Janis to trust him.

Defendant denied any intent to divorce Ellen and testified he had no intention to marry Janis. However, sometime following Ellen's death, he told Janis' father he was in love with Janis.

On November 16, 1974, defendant made a date with Janis to pick her up from work at 11:30 p.m. At 7:01 p.m., telephone

- 2 -

records indicated he called his Baker home from a telephone booth in Wibaux, Montana, 45 miles from Baker, charged to his business credit card, and talked for 2 minutes. Defendant testified he then drove to Glendive and went coon hunting in western Richland County, without a gun. His hunting consisted of using a stick and flashlight, striking the coons between the eyes.

At about 11:15 p.m. that evening, defendant called Janis from Savage, Montana, and told her he was running late and would pick her up about 12:15 or 12:20 a.m. She testified this was the first time he had been late in their two year courtship. He later advised her he had pickup trouble.

Ross Wilson of Savage, Montana, a key witness for the state, went to Glendive the evening of November 16 to see a movie. He left Glendive about 10:00 p.m. He testified he was anxious to get home and drove at 80-90 miles per hour on the trip home. He was approximately four miles south of Savage when he came upon an orange Ford pickup truck, parked in his lane of traffic. / Because his parents lived nearby he thought it might be poachers, so he slowed down and checked the license number, getting the county designation 39- and the first and last numbers of 1--9. The middle two numbers he could not catch due to the fact they were partially covered with dirt. Estimating his speed between Glendive and the parked truck, he thought he came upon the orange pickup at about 10:30 p.m. He slowed down to 12 to 15 miles per hour before passing the truck and in so doing noted there were two occupants of the truck cab; a passenger was getting into the truck and a man was bent over in an effort to close the door. He noted the driver had dark hair. Upon hearing of the "accident" later that night, he went to the scene and reported this information to a fireman and the undersheriff. Defendant was

- 3 -

driving his orange Ford pickup, with license number 39-1969.

Savage, Montana is located approximately 23 miles south of Sidney on the highway to Glendive. At approximately 11:15 p.m., November 16, 1974, a witness Clinton Patterson was driving toward Glendive. About four miles south of Savage he saw a glowing on the side of the hills. When he arrived at the scene he saw a car in a ravine with flames coming out of the window area and around the hood.

About this same time a beet truck arrived at the scene. This truck was driven by off-duty highway patrolman Jack Gaughan, who instructed Patterson to return to Savage and call the fire department and authorities. Gaughan could only get within 10 to 12 feet of the car, since it was burning fiercely, but he read the license number of the car as 39-924. The vehicle was registered in the name of Ellen Sharbono and defendant. Other officers, the Savage fire department, and the coroner subsequently arrived at the scene. The fire department took about 25 minutes to control the fire. By this time the badly charred remains of Ellen Sharbono had been discovered lying on the floor board, with her head against the passenger side of the car. The victim's body was removed by the coroner.

In the early morning of November 17, 1974, defendant was located at a motel in Sidney and notified of his wife's death. His truck, with license number 39-1969, was parked at the motel. About 4:15 a.m. on November 17, 1974, the Sharbono truck was seen stopping at the home of Jim Fischer, a retired highway patrolman and brother-in-law of defendant married to defendant's sister, Louella.

- 4 -

Fischers testified defendant called them to tell them of Ellen's death and asked to come out to their home. They testified he was very upset when he arrived and it had been an emotional experience. Defendant talked with them for sometime and slept on a couch in the living room for an hour and half early in the morning of the 17th. During his conversations with the Fischers, from the testimony of numerous witnesses, it would appear defendant made an effort to get them to provide an alibi for him by stating: "You can say we was fox hunting together."

The Fischers told this story about fox hunting to several investigating officers and it was not until December 26, the day of defendant's arrest that Jim Fischer voluntarily went to the county attorney's office and gave him a corrected story.

In the meantime, on November 20, upon learning that his wife's body had been taken to Great Falls, defendant contacted Fischers and had them drive over a country road from Sidney to Wibaux with him. During this trip he had them note certain places where he said he had been, at specified times, during the evening of November 16-17. During defendant's visit to the home of Fischers on the 17th, he asked his sister to say they were playing "pinochle" that evening. When his sister asked him why she should say that, he replied "I was on that road--the Glendive-Sidney road". He also told his sister he called his girl friend from Savage at about 11:00 to 11:10 p.m. on November 16. At no time during his testimony did defendant admit being on the particular section of the Glendive-Sidney road where the accident occurred.

Investigation of the accident revealed the victim's car went off the road at almost a 90° angle. This was described by the investigators as a most unusual angle of leaving the highway.

Investigation by the state fire marshal's office revealed the fire was caused by accelerants, starting in the passenger portion of the victim's automobile. The chemist from the state crime laboratory concluded the gasoline sample taken from the interior of the victim's car was a different gasoline than that in the tank of the automobile.

On November 20, 1974, Dr. Joseph McKinley, a Sidney pathologist, made a partial autopsy and found fractures of the hyoid bone and thyroid cartilage, which to him indicated manual strangulation. On December 20, 1974, the body was flown to Great Falls where a complete autopsy was performed jointly by Dr. McKinley and Dr. Pfaff, a forensic pathologist. Both concluded Ellen Sharbono died of manual strangulation. The victim's own doctor testified that Ellen Sharbono was previously in good health.

In addition, the state introduced evidence that defendant obtained life insurance on his wife on September 24, 1974. The policy was a joint whole-life policy for Loren and Ellen Sharbono in the amount of $150,000. Defendant's agent testified he had suggested the additional insurance due to defendant's going into business for himself.

On appeal, defendant presents 14 issues for this Court's review:

1)  Was Patrolman Gaughan improperly allowed to give an unresponsive answer and testify as to his opinions and conclusions in describing the burning car?

2)  Was Patrolman Rowe improperly allowed to testify as to a self-serving statement by saying he went to view the car "to gather evidence"?

3)  Was Patrolman Kaul/allowed to give his opinion as to the speed of the car when it left the highway and its speed when

- 6 -

it hit the bottom of the ravine without proper foundation?

4) Was Exhibit A-14, a gaschromebiography analysis of gasoline, improperly admitted into evidence without sufficient foundation?

5) Was it error to permit Dr. Pfaff to repeat his opinion that the cause of death was by strangulation?

6) Was hearsay testimony improperly allowed into evidence when Mary McGonigal testified as to a telephone conversation she had with Ellen Sharbono?

7) Was hearsay testimony improperly allowed into evidence when James Fischer testified as to a telephone conversation he had with the county attorney?

8) Was the state improperly allowed to impeach its witness, James Fischer, without a showing of surprise?

9) Was there sufficient evidence at the close of the state's case to go to the jury?

10) Should the case have been dismissed at the close of the state's case because the medical testimony failed to satisfy the circumstantial evidence test by failing to rule out all other reasonable hypotheses as to the cause of death other than strangulation?

11) Was the sheriff improperly allowed to present hearsay and conclusionary testimony by stating he had no reason to believe Wilson would be involved?

12) Was the sheriff improperly allowed to repeat his testimony about Wilson?

13) Was it error for the district court to refuse the "burn film"?

14) Did the district court err in refusing Sharbono's proposed instruction #14 which defined "deliberation"?

Issues 1, 2 and 3 involve the testimony of three highway patrolmen and will be considered as one.

Jack Gaughan was one of the first witnesses on the scene. Before going down to the burning car, he sent Patterson, the first witness on the scene, to Savage to get help from the volunteer fire department. Gaughan estimated his time of arrival at the scene between 11:15 and 11:30 p.m. He took an extinguisher from his truck down to the fire in an effort to extinguish it, but was unable to get closer than from 10 to 12 feet, due to the intensity of the fire. In describing what he saw, he said "* * * it would---like a piece of rag burning that has been oil soaked or something, to me it reminded me of ----." Defendant's counsel objected alleging the answer was not responsive and was the opinion and conclusion of the witness.

Defendant argues the court erred in overruling his objection and cites numerous cases and text in support of his objection. We have examined those cases and text cited and find none controlling.

Here, Gaughan was asked the question "Would you describe what you saw in regard to the burning vehicle?" The answer was a description of what Gaughan saw and defendant objected and moved to strike the entire answer as not responsive and as an opinion and conclusion. No effort was made to specifically point out what his objection was directed to and it was an improper objection. A witness, as the witness here, who saw the car burning, may, after stating as much as he can of the constituent facts, state his impression or inference with respect to what he saw. In re Miller's Estate, 36 Utah 228, 102 P. 996; Paulich v. Nipple, 104 Kan. 801, 180 P.771; Hill v. Chappel Bros., 97 Mont. 305, 33 P.2d 819; Union Pacific Ry. Co. v. Gilland, 4 Wyo.395, 34 P. 953; 32 C.J.S., Evidence §546(9).

- 8 -

Defendant next objects to the testimony of Patrolman Rowe as "self-serving". Rowe, along with several other investigating officers, went to the fairgounds where the burned vehicle was stored for the purpose of getting certain parts of the vehicle that where later used in this case. The testimony and objection was:

> "Q. Was there any purpose in going out and meeting with these other parties you described on the 25th of November? A. Yes.
>
> "Q. What was that purpose?
>
> "MR. MOSES: I object upon the ground that it is self-serving."

We find no merit to defendant's argument. Rowe was a part of an investigative team for the purpose of "gathering evidence". His answer was not a self-serving statement. 31A C.J.S. Evidence, §216, p. 590, states the rule regarding self-serving declarations:

> "A 'self-serving declaration' within the rule is one made by a party in his own interest at some time and place out of court, and does not include testimony which he gives as a witness at the trial."

See Welch v. Thomas, 102 Mont. 591, 601, 61 P.2d 404.

Defendant also objected to the testimony of Sgt. John Kaul of the highway patrol as to his opinion of the speed of the death vehicle when it left the road. Sgt. Kaul testified he had been a highway patrol sergeant for approximately 12 years; had considerable special training in accident investigations and had investigated some 300 accidents. He qualified as an expert in his field.

Kaul stated, in his opinion, the vehicle left the road at "a very low rate of speed" --- somewhere in the vicinity of from 10 to 15 miles per hour. Prior to that testimony, he had

totally familiarized himself with the scene, observed the tracks of the vehicle on the grass slope, checked for skid or gouge marks on both the slope and highway and found none, observed the damage done to the automobile caused by its coming to rest against the bank of the ravine, took photographs of the scene (later used as exhibits), and noted the unusual angle of the vehicle as it left the highway. The trial court properly admitted this testimony. The rule in Montana relating to the admission of expert testimony is set forth in Haynes v. County of Missoula, 163 Mont. 270, 517 P.2d 370.

This Court has held highway patrolmen are experts in their field of accident investigation. See: State v. Souhrada, 122 Mont. 377, 204 P.2d 792; State v. Stoddard, 147 Mont. 402, 412 P.2d 827; State v. Deshner, 158 Mont.188, 489 P.2d 1290; 8 Am Jur 2d, Automobiles and Highway Traffic §990.

We find defendant's issues 1, 2 and 3 to be without merit.

Issue 4, alleges there was insufficient foundation for the admission of evidence obtained from the gaschromebiography. We find no merit in issue 4.

The objection arose during the testimony of Arnold Melnikoff, the forensic chemist and lab supervisor of the criminal investigation department when he tried to use a chart to illustrate the gaschromebiography analysis of gas samples taken at the scene and from the burned vehicle.

Following extensive direct examination and cross-examination on the operation and use of the gaschromebiograph, and a discussion in chambers with the judge, counsel for defendant made his objection as to the competency of the evidence in a criminal case. The court ruled a proper foundation had been laid and stated:

"* * * Certainly I am convinced it was adequate
after you [Moses] got through with him. I think
I understand the process but I am not sure it makes
it more competent evidence, but in mind I am much
more familiar with the process. * * *"

Defendant's objection can be divided into two parts:

1) The lack of foundation of the verification of the accuracy of

the instrument. 2) The competency of the gaschromebiograph in a

criminal case.

1) The foundation was laid by the qualifications of

Melnikoff, the state chemist, and his testimony of how the machine

was periodically checked and that it was in good working order.

2) Concerning the competency of such evidence on the

fractionation of mixtures of substances and its ability to analyze

both organic and inorganic compounds, see: The Cyclopedia of

Chemistry, 2d Ed.(1966); The Journal of Chromatopgraphy, a 116

volume work of scientific scholars; and the Journal of Forensic

Medicine from 1971 through 1976.

While admission of this type of evidence in a criminal case

is a matter of first impression in this jurisdiction, we have

allowed its admission in a civil case, Jangula v. United States

Rubber Co., 147 Mont. 98, 410 P.2d 462. Several states, Missouri,

California, Arkansas and Vermont have allowed its admission in

criminal cases. State v. Perryman, (Mo.App. 1975), 520 S.W.2d 126;

State v. Munn, 257 Ark. 1057, 521 S.W.2d 535; People v. Rawlings,

42 Cal.App.3d 952, 117 Cal.Rptr. 651; State v. Burack, 133 Vt.

482, 346 A.2d 192, 194; 23 C.J.S., Criminal Law, §858(2), p. 380.

We adopt the position of the Vermont Court in Burack in allowing

the admission of the tests made by a gaschromebiograph.

This Court has long held it is within the jurisdiction

of the trial judge to admit scientific and expert testimony. We

find no abuse of that discretion here. Graham v. Rolandson, 150 Mont. 270, 435 P.2d 263; Hurley v. Star Transfer Company, 141 Mont. 176, 376 P.2d 504.

Issue 5 is directed at alleged repetitious opinion testimony of Dr. Pfaff, the forensic pathologist. During direct testimony Dr. Pfaff testified that, in his opinion "I believe she died as the result of manual strangulation and asphyxia therefrom."

On redirect, he gave the same testimony in answer to a question---over the objection of defendant. The redirect testimony came after defendant's cross-examination where an effort was made to establish the cause of death occurring from a steering wheel injury. Its purpose was to clarify any question in the minds of the jury members as to what was Dr. Pfaff's expert opinion on the cause of death. We find no error. Moore v. Tremelling, 100 F.2d 39; 3 Wigmore, Evidence, §782(2) (Chadbourn Rev. 1970); 4 Jones on Evidence, §28:7.

Issue 6 is directed to hearsay conversations between Ellen and Mary McGonigal, a nurse and neighbor friend of Ellen. They saw each other daily and talked often on the phone. Mary McGonigal testified she could recognize Ellen's voice on the phone, she knew of Ellen's plans to spend the weekend with defendant, and had, in fact, loaned her a suitcase to go on the trip. She was allowed, over objection and after argument in chambers to testify that she talked on the phone with Ellen on November 5 about her weekend plans; that Ellen was afraid to drive at night and that she would not go on the weekend unless her husband drove. The trial court allowed the admission of the testimony under the state-of-mind exception to the hearsay rule. We agree.

The hearsay rule generally excludes statements made out of court, where the speakers are not present to be examined. There are exceptions made for statements and acts which serve to explain the act in question where the speaker is incapable of being present. Telephone conversations, as in this case, are admissible. 22A C.J.S. Criminal Law §662(2)(4); Anno. 113 A.L.R. 268 303, § V(b)(2).

This Court in Thompson v. Steinkamp, 120 Mont. 475, 481, 187 P.2d 1018, allowed hearsay testimony to show intent. The Court said:

> "' When intent is a material element of a disputed fact, declarations of a decedent made after as well as before an alleged act that indicate the intent with which he performed the act are admissible in evidence as an exception to the hearsay rule * * *.'"

Testimony relative to the intent of a decedent as to destination or taking a trip is admissible and is one of the state-of-mind hearsay exceptions. Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L ed 706; People v. McMonigle, 29 Cal.2d 730, 177 P.2d 745. In a case nearly on all fours with the instant case the Supreme Court of Oregon in State v. Bartolon, 8 Ore.App.538, 495 P.2d 772, admitted a statement by deceased of her intent to go to a certain place.

In the instant case arguments of both counsel were made to the court in chambers, questions to be propounded to the witness Mary McGonigal were discussed and many were dropped by the county attorney due to defendant's objections. In the end the solution on admissibility was in the hands of the trial court whose sound discretion is subject to review only in a case of manifest abuse. None is found here. State v. Medicine Bull, Jr., 152 Mont. 34, 445 P.2d 916.

- 13 -

Issue 7 is directed at hearsay testimony by a witness in a telephone conversation with the county attorney. Defendant contends it was error to permit James Fischer, defendant's brother-in-law, to testify as to a hearsay conversation he had with the county attorney. Fischer had given a statement to the county attorney that the defendant had been hunting with him on the night of November 16. The conversation referred to was between James Fischer and the county attorney:

"Q. Prior to that time, Mr. Fischer, before any conversation that we have been refreshing your memory on on the statement, did you make any statement to any law enforcement officer about going to the Sidney-Wibaux road with the defendant and stopping at a pay booth where you made a telephone call on November 16, 1974? A. Go over that one more.

"Q. Prior to the time that -- let me go back a minute. After you learned that the defendant had been arrested and what he was charged with, what did you do? Did you notify anybody? A. Not that I know of really. If mean, if I did now you can refresh my memory.

"Q. All right, that very evening, did you call the County Attorney? A. I did, sir.

"Q. What did you say? A. I simply lied to you."

No error is found in the court's ruling. Where the witness can answer the question propounded to him of his own knowledge, and the value of his testimony does not depend in any degree upon the veracity or competency of any other person, his answers are not objectionable as hearsay. In State v. Crean, 43 Mont. 47, 59, 114 P. 603, a similar fact case, this Court said:

"* * * Our Code * * * provides: ' A witness can testify to those facts only which he knows of his own knowledge', etc. The term 'hearsay,' as used in the law of evidence, signifies all evidence which is not founded upon the personal knowledge of the witness from whom it is elicited * * *. The principal objections to this species of evidence are (1) that it is not given under oath--that is, that

- 14 -

the person whose words are repeated was not under oath--
and (2) that such person is not subject to cross-examination.
That the evidence sought to be elicited by these questions
was not hearsay is apparent enough. The witness could ans-
wer every question of his own knowledge, and the value of
the testimony given did not depend in any degree upon the
veracity or competency of any other person."

See also: McGonigle v. Prudential Insurance Co., 100 Mont. 203,

221, 46 P.2d 687.

Issue 8 relates to charges the state was erroneously per-

mitted to impeach its own witness without showing surprise.

James Fischer, defendant's brother-in-law, who made the

quoted statement in Issue 7, and who went with defendant over the

Sidney-Wibaux road to cover defendant's travels on the night of

the death, was a most reluctant witness for the state. This re-

luctance came after he called the county attorney and admitted

he lied and after voluntarily going to the county attorney's

office and giving a clarifying statement. That statement was taken

home by Fischer and his wife a week before the trial for any

corrections, but in spite of all of this he was a most evasive

witness. Finally, after two sessions in the judge's chamber and

some 30 pages of testimony, the trial court declared him a hostile

witness and allowed impeachment. The state contends that it was

refreshing the witness' memory, but since the defense's objection

is to impeachment, we cite the Montana sections pertinent:

> Section 93-1901-8, R.C.M. 1947. "The party producing
> a witness is not allowed to impeach his credit by
> evidence of bad character, but he may contradict him
> by other evidence, and may also show that he has made
> at other times statements inconsistent with his present
> testimony as provided in section 93-1901-12."

> Section 93-1901-12, R.C.M. 1947. "A witness may also be
> impeached by evidence that he has made, at other times,
> statements inconsistent with his present testimony; but
> before this can be done the statements must be related to
> him, with the circumstances of times, places, and persons

present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them."

Here, Fischer voluntarily gave a statement correcting a previous statement and was also allowed time to correct same. He failed to tell the truth and the trial judge, from all the testimony he heard and from what he saw of the witness, ruled the county attorney was surprised. We find no merit in defendant's Issue 8.

Issue 9 questions whether there was insufficient evidence at the close of the state's case to grant a motion to dismiss.

Defendant directed his motion on an alleged failure of the state to establish his presence in the vicinity or as to the evidentiary value of the attempt by defendant to establish an alibi. The court recognized the problems of the case at that point of the trial and ruled there was sufficient circumstantial evidence before the jury with (1) the double indemnity insurance, (2) the proposal of marriage to the girl friend, (3) the alibi attempt, and (4) the statement of the defendant made to Mary McGonigal on the day of Ellen's funeral.

Defendant cites authority that there must be substantial proof to convict and suspicion is not enough. He relies on State v. McCarthy, 36 Mont. 226, 92 P. 521; State v. Powers, 39 Mont. 259, 102 P. 583; State v. Brower, 55 Mont.349, 117 P. 241; State v. Merseal, 167 Mont. 409, 538 P.2d 1366, 32 St.Rep. 823. We find the cases cited unrelated to the issue of alibi and have little value to the facts here.

The thrust of defendant's motion was directed at the alibi testimony. We find the rule on such testimony stated in People v. Wayne, 41 Cal.2d 814, 264 P.2d 547, 551, where it was said:

- 16 -

"'* * * But where a material fact is established by evidence and it is shown that a defendant's testimony as to that fact was wilfully untrue, this circumstance not only furnishes a ground for disbelieving other testimony of this defendant * * * but also tends to show consciousness of guilt or liability on his part and has probative force in connection with other evidence on the issue of such guilt or liability. Such false testimony is in the nature of an admission from which other evidence guilt or liability may be inferred.'"

See also: 2 Wigmore, Evidence, § 278.

Here, the court noted the circumstantial evidence before the jury and found it sufficient to overrule defendant's motion to dismiss. We find no error in the court's ruling for not only was there an attempt to establish an alibi but there was testimony that (1) placed defendant at the scene, (2) established motive for the crime, (3) showed deceased feared night driving, (4) the medical testimony on the cause of death, and (5) Mary McGonigal's testimony as to this conversation with defendant on the day of Ellen's funeral:

"Q. Would you cite as near as possible the conversation? A. He said: 'Mary, I am awfully sorry about your suitcase and I want to replace it' and I told him it was all right.

"Q. Did you have any reaction to that? A. Yes, I did because nobody knew I loaned it."

See: State v. Cor, 144 Mont. 323, 396 P.2d 86.

Issue 10 contends error because the trial court failed to dismiss at the close of the state's case on the basis that the medical evidence as to death failed to satisfy the circumstantial evidence test. While the two pathologists could not rule out a blow to the neck from the steering wheel, they both found other evidence of damage that the throat fractures would have been in different locations had there been a blow to the windpipe. In that case the fractures would have been along the sides, not the front. Both pathologists testified that Ellen was dead before

the fire began and in their opinions death was caused by asphyxiation, due to manual strangulation.

Defendant cites State v. Allen, 34 Mont. 403, 415, 87 P. 177, for the rule for admitting circumstantial evidence. There the Court speaking to an instruction, noted:

> "* * * Reading this paragraph with the rest of the charge, we do not think the jury could have been mislead; yet, it should have stated that the jury should convict only if the circumstances were of such a character as to satisfy the minds of the jury of the guilt of the defendant beyond a reasonable doubt to the exclusion of every reasonable hypothesis other than the guilt of the defendant." (Emphasis added.)

While we do not disagree with this citation in an early case of this Court, we find the evidence here could well have satisfied the minds of the jurors "to the exclusion of every reasonable hypothesis." This Court in State v. Fitzpatrick, 163 Mont. 220, 227, 516 P.2d 605, stated:

> "* * * this Court held in reviewing a case the Court is to give to each circumstance in evidence all the legal effect toward guilt which it could support to see whether a rational conclusion of innocence was excluded. * * *"

See: State v. Radi, ____Mont.____, 542 P.2d 1206, 32 St.Rep. 1143; State v. Cor, supra; State v. DeTonancour, 112 Mont. 94, 98, 112 P.2d 1065; State v. Warrick, 152 Mont. 94, 446 P.2d 916.

Issue 11 alleges that hearsay and conclusion testimony was permitted by the sheriff. Over the objections of the defendant the sheriff was allowed to testify to what was clearly hearsay and conclusion answers in regard to matters concerning whether or not Ross Wilson was involved. Allowing the sheriff to testify in the manner he did was improper and error. However, we do not find it so prejudicial as to require reversal. Before this Court will reverse a judgment, prejudice must be shown. State v. Totterdell, 135 Mont. 56, 336 P.2d 696; State v. Hay, 120 Mont. 573, 194 P.2d 232.

Defendant's Issue 12 alleges the sheriff's statements, discussed in Issue 11, were repetitious. We find no error. The matter is discretionary with the trial court and no substantial rights of defendant were damaged.

Issue 13 alleges the court erred in refusing to allow the jury to view a "burn film" offered by the defense. Defense called as its witness Dr. F. D. Lee, a physics teacher from Ball State University, Muncie, Indiana, who testified as to the speed of the death vehicle and the injuries that could have resulted. The defense then attempted to put into evidence a film which demonstrated six different car burnings, and a film that had been prepared to demonstrate what could happen as far as fires were concerned when cars were involved in collisions. Defendant argues this evidence was vital to the defense in view of the testimony given by state witnesses and that under Montana law it was error not to allow the jury to see these films, citing Gobel v. Rinio, 122 Mont. 235, 238, 200 P.2d 700.

Here, the court viewed the film in chambers and noted that all six collisions dealt with rear end collisions where the gas tanks were ruptured and noted that there was no rupture in the instant case, further that there was no evidence of a fuel line rupture or a showing of gas burning underneath the car. The trial court denied a showing of the films.

This Court considered the same issue in Leary v. Kelly Pipe Co., _____Mont._____, 549 P.2d 813, 817, 33 St.Rep. 413, 417, involving the negligent unloading of a truck where the trial court excluded evidence on a showing of the proper method of loading a truck, and said:

"These photographs do not depict any condition related to this controversy. The pictured trucks are different trucks loaded differently from the F-B truck and trailer involved in this case. We find no error in excluding them."

Here, the films involved experiments with different and smaller vehicles in crash situations entirely different than the facts here. Leary controls and as noted in Gobel, cited by defendant:

"This court is committed to the view that the trial court has a wide discretion in admitting any diagram, map or photograph * * *."

Defendant's Issue 14 concerns the court's denial of defendant's offered instruction No. 14 as to the required intent for deliberate homicide. Defendant's proposed instruction No. 14 reads:

"You are instructed that homicide which is perpetrated by any kind of willful, deliberate and premeditated killing is committed purposely or knowingly and is deliberate homicide.

"To constitute this type of crime, the killing must be accompanied and must be preceded by a clear deliberate intent to take life, an intent to kill which must be the result of deliberation and premeditation so that it must have been formed upon a preexisting reflection and not under a sudden heat of passion or other condition such as precludes the idea of deliberation."

It is defendant's position that before he can be convicted of this crime the state must beyond a reasonable doubt satisfy its burden that defendant had a guilty mind, a guilty or wrongful purpose, a criminal intent. In support he relies upon a number of cases but principally the holding in Morissette v. United States, 342 U.S. 246, 96 L ed 288, 72 S.Ct. 240. Defendant argues that under the instructions given by the court the necessity for the jury to find defendant's mens rea (criminal intent) is eliminated. Further that knowingly and purposely, as defined by the Montana Criminal Code, and as given in the court's given instructions do not include this vital element and therefore failure to give defendant's proposed instruction No. 14 was error.

The statute involved is section 94-5-102, R.C.M. 1947, the pertinent part of which reads:

"Except as provided in section 94-5-103(1)(a), criminal homicide constitutes a deliberate homicide if:

"(a) it is committed purposefully or knowingly".

The Commission Comment states:

"Section 94-5-102 relates only to conduct which is done deliberately; that is, purposely or knowingly. * * *" (Emphasis supplied.)

What the legislature did, in enacting the Montana Criminal Code 1973, was to reduce the difficulty in this area by articulating general principles that shall apply when the definitions of a particular offense are ambiguous. The culpability requirements adhere to familiar concepts, purposely, knowingly. Upon the whole it is the person who means to do the thing that constitutes a crime , knows he is doing it, and knows that there is a substantial and unjustifiable risk in doing it, whose conduct warrants condemnation of the kind from which conviction results.

The problem of scienter, guilty knowledge, goes to the question of culpability generally and has been usually dealt with by the concept of mens rea. While culpability is variously stated in criminal statutes in terms such as "willful","willfully and unlawfully", "with intent to" and other phrases, these exact words are not necessary in determining whether the statute is vague. The United States Supreme Court has held in a series of cases that a statute will not be evaluated on its face, but

only in the context with which a defendant is charged. United States v. Petrillo, 332 U.S. 1, 91 L ed 1877, 67 S.Ct. 1538. It has also looked into the requirement of scienter in the statutory definition of the crime in words like "willfully", "intentionally" and "knowingly" as overcoming the vice of vagueness. Boyce Motor Lines v. United States, 342 U.S. 337, 91 L ed 367, 72 S.Ct. 329.

Under the provisions of section 94-5-102, R.C.M. 1947, the necessary requirements for "mens rea" and "criminal intent" are embodied in the use of the new language of the statute "purposely" and "knowingly". The court's given Instruction No. 17 defined both "purposely" and "knowingly" in terms set forth in section 94-2-101, R.C.M. 1947. It is defendant's contention the homicide statute requires more to be clear. We do not agree, for it is clear from the Commission Comment that it was the legislative intent to replace such terms as "deliberately".

This Court in State v. Klein, ____Mont.____, 547 P.2d 75,78, 33 St.Rep. 283,288, spoke to this issue. In Klein, a robbery case, it was alleged the trial court committed error in refusing defendant's instruction defining "feloniously". There we referred to the Annotator's notes under section 94-2-101, Montana Criminal Code of 1973, Annotated, which stated:

"A major problem of prior Montana criminal law was the use in the code of numerous terms affecting culpability that were largely undefined. Under the new Code, the mental states required for various degrees of culpability are defined carefully in a hierarchy. 'Purposely' is the most culpable state and implies a design. This term replaces a term frequently used in the old code, 'intentionally' * * *."

The Court then stated:

"It is clear that the legislature intended the words 'purposely' and 'knowingly' would substitute for the word 'felonious' (i.e. intentionally) as used in the old code.* * *"

Here, the court gave defendant's offered instruction No. 17, defining both "purposely" and "knowingly". We find no error.

Judgment of the trial court is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices.