UNITED STATES of America, Appellee,

v.

John GLOVER, Val Irick, Cornelius Reed, Defendants-Appellants.

Nos. 246, 247, 266, 267, Dockets 78–1183, 78–1239, 78–1240, 78–1241.

United States Court of Appeals, Second Circuit.

Argued Oct. 12, 1978.

Decided Dec. 12, 1978.

---

Federico E. Virella, Jr., Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Robert J. Jossen and Howard W. Goldstein, Asst. U. S. Attys., New York City, on the brief), for appellee.

Stephan H. Peskin, New York City, for defendant-appellant John Glover.

Patrick T. Burke, Suffern, N. Y. (Miele, Burke & Whitman, Suffern, N. Y., on the brief), for defendant-appellant Val Irick.

C. Joseph Hallinan, Jr., New York City, for defendant-appellant Cornelius Reed.

Before LUMBARD and OAKES, Circuit Judges, and MacMAHON, District Judge.*

PER CURIAM:

John Glover and his co-defendants Val Irick and Cornelius Reed appeal from their convictions after a two week trial before Judge Palmieri in the Southern District on charges of conspiracy to violate the narcotics laws. We affirm.

The conspiracy involved a network for the distribution of heroin extending from

* Of the Southern District of New York, sitting by designation.

its principal situs in New York City to such distant points as Los Angeles and Daytona Beach. At the center of this network were Willie Lee Hardy and Phyllis Scott, partners in both crime and romance, and the government's primary witnesses at trial. Hardy, a confessed trafficker in heroin of some ten years experience, was the true hub of the conspiracy, dealing with the present appellants variously as a purchaser, transporter and seller of heroin.

Glover contends that the trial court abused its acknowledged discretion regarding the scope of cross-examination by forbidding questioning of Scott concerning psychiatric treatments she received some twelve years prior to trial. Alleging that the psychiatric treatments were prompted by various romantic setbacks, Glover argues that they indicate Scott's imbalance in such matters and suggest that she may have shaded her testimony in favor of her paramour Hardy.

■ We find no error in the trial judge's limitation on cross-examination. After examining Scott's psychiatric records and questioning Scott outside the presence of the jury, Judge Palmieri concluded that Scott's prior psychiatric episode did not affect her competence as a witness and was not otherwise relevant to any substantive issue at trial. Given the broad discretion that is accorded to the trial judge in such matters, the remoteness in time of the psychiatric treatments, and the clearly tenuous connection that is asserted to exist between those treatments and Scott's present reliability as a witness, we see no reason to question that judgment. *Cf. United States v. Green*, 523 F.2d 229, 237 (2d Cir. 1975), cert. denied, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). We note, in addition, that Glover was permitted to cross examine Scott extensively concerning matters that might have affected her credibility as a witness, including her relationship with Hardy. In sum, there is no basis for concluding that the trial judge's ruling was

erroneous or that it resulted in prejudice to Glover.

■ Glover also contends that the trial court's sentence imposing upon him the costs of prosecution abridges his right under the Fifth Amendment to remain silent and not plead guilty as well as his Sixth Amendment right to a trial. 28 U.S.C. § 1918(b), the statute authorizing the imposition of costs, provides:

"Whenever any conviction for any offense not capital is obtained in a district court, the court may order that the defendant pay the costs of prosecution."

The government has urged that § 1918(b) does not in any way punish the exercise of a defendant's right to stand trial and not plead guilty since the statute by its terms authorizes the imposition of costs for any convicted defendant, including those who plead guilty. This argument seems wide of the mark, however, since it does not appear that the costs assessed under § 1918(b) include any pretrial expenses.[1]

But even assuming that the statute has no practical application to the convicted defendant who has pled guilty, we cannot agree that § 1918(b) impinges on a defendant's right to deny guilt and stand trial. If the statute directed that costs of prosecution be assessed against all convicted defendants, there would be some basis for concern that it served to "chill the assertion of constitutional rights by penalizing those who choose to exercise them." *Fuller v. Oregon*, 417 U.S. 40, 54, 94 S.Ct. 2116, 2125, 40 L.Ed.2d 642 (1974), citing *United States v. Jackson*, 390 U.S. 570, 581, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). Clearly, however, § 1918(b) does not operate in that fashion. It directs only that costs may be assessed, and thus leaves to the sound discretion of the district court the determination of whether the government may recoup the expenses it has incurred by prosecuting a defendant. Since the defendant's ability to

---

1. The expenses charged to Glover totalled some $3,637.75, and consisted of docket fees and the cost of producing a printed transcript.

pay will, as it was in the instant case,[2] be a paramount factor in determining whether the imposition of costs is appropriate, § 1918(b) does not impinge upon the right to stand trial but simply "depriv[es] a financially able defendant of available funds which, in fairness, should be remitted to the public coffers." *United States v. Bracewell*, 569 F.2d 1194 (2d Cir. 1977).[3]

Appellant Reed's primary contention is that the government knowingly used perjurious testimony to obtain his conviction. The alleged perjurer is the government's witness Hardy, who testified that in late 1974 or early 1975 Reed introduced him to a potential supplier of heroin in Los Angeles and that during May or June of 1975 Reed was present in Hardy's New York apartment when a sale of heroin was made. Reed's claim of perjury is based on the now undisputed fact that Reed spent July 16, 1974 to April 4, 1975 in a California prison. Reed also presented evidence that he was employed part time at a Los Angeles day care center from April 7, 1975 until June 23, 1975, which, according to Reed, demonstrates that Hardy's testimony concerning Reed's presence in New York was false.

An examination of Reed's claims, however, reveals that he has failed to establish either that Hardy's testimony was perjurious or that the government's behavior was improper. Hardy's testimony concerned events that were four years distant, and it is clearly possible that the substance of his testimony was accurate though mistaken by a few months with regard to specific dates. Moreover, with regard to Reed's alleged presence at the sale of heroin in Hardy's apartment in New York, it is possible that Hardy's testimony was accurate even as to the date. The fact that Reed was employed *part time* in Los Angeles between May and June of 1975 would not rule out his presence in New York at some point during that time period.

Of course, even if Hardy's testimony were not perjurious, but simply mistaken, and the government had not been aware of the inaccuracies until after the testimony was given, the government still would have a duty under the Fourteenth Amendment not knowingly to allow false testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). It is evident from the record, however, that the government did not receive firm information on the inaccuracies in Hardy's testimony until several days after the jury returned its verdict; until then the information in its possession did not contraindicate day passes received by Reed during his incarceration. Before receiving firm information that Reed could not have introduced Hardy to a supplier of heroin during his incarceration, the most that can be said is that the government was less than completely diligent in digging out the information as to whether Reed had day passes. Such a lack of diligence does not rise to the level of a breach of the United States Attorney's basic duty, as "the representative . . . of a sovereignty" to see "that justice shall be done." *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The only feasible "remedy" for this kind of lapse from perfect prosecutorial technique, if such it was, remains vigorous defense impeachment.

We have examined appellants' other arguments and find them to be without merit. Accordingly, the convictions are affirmed.

---

2. Glover admitted at sentencing that he had assets of over $600,000. In response to an objection by Glover's counsel to the imposition of costs, Judge Palmieri stated "Here is a rich criminal with fantastic assets who has probably laundered his ill-gotten gains. And you say that all of the fantastic funds that the government has spent to investigate and to try this case should be a burden on the community, in addition to the harm that was done by his criminal activities.

"I am surprised that you even think that that should be done."

3. For the same reason there is no merit to Glover's argument that § 1918(b) denies equal protection of the laws to convicted defendants who have exercised their right to stand trial. The classification created by the statute is based not on the defendant's decision to stand trial but on factors such as the defendant's ability to reimburse the government.