No. 82-180(A)

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

ARROW WEINBERGER,

        Defendant and Appellant.

Appeal from: District Court of the Fifteenth Judicial District,
In and for the County of Roosevelt,
The Honorable M. James Sorte, Judge presiding.

Counsel of Record:

      For Appellant:

          Skedd, Ashley, McCabe, Weingartner & McCarter;
          J. C. Weingartner argued, Helena, Montana

      For Respondent:

          Hon. Mike Greely, Attorney General, Helena, Montana
          Chris Tweeten argued, Asst. Atty. General, Helena,
          James McCann, County Attorney, Wolf Point, Montana

                Submitted:    January 10, 1983

                  Decided:    June 6, 1983

Filed: JUN 6 1983

*Ethel M. Harrison*

Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant Arrow Weinberger was convicted of deliberate homicide by a Roosevelt County jury for the shooting death of Floyd "Scotty" Azure at a Culbertson service station on December 5, 1982. Defendant's twenty-year-old son, Adam, was convicted of felony murder for his part in the incident. Arrow was sentenced to serve seventy years in the Montana State Prison and was ordered to pay certain expenses incurred in the presentation of the charges against him. His motion for a judgment notwithstanding the verdict or for a new trial was denied. He appeals. We affirm.

The circumstances leading up to the shooting at a Culbertson service station began sometime earlier. Adam Weinberger, a resident of Fort Smith, Arkansas, had been living in northeastern Montana. Beginning in June 1981, he attempted to establish a relationship with Luanne Azure, the seventeen-year-old daughter of Scotty and Gloreen Azure. Azures were opposed to an involvement between Luanne and Adam because he was older than Luanne and because of Adam's failure to "act like a gentleman." Despite Azures' opposition, Adam and Luanne continued to see each other.

On November 10, 1981, Luanne ran away from home with three friends and went to Havre, Montana. Adam did not accompany Luanne to Havre, but she called him from there and made arrangements to meet him in Williston, North Dakota. Azures searched the Poplar area for Luanne without success. On November 12, they traveled to Williston to look for her. They found Adam Weinberger, who falsely told them that he had not seen Luanne and thought she was in Havre. Later that day Azures discovered Luanne in Williston and learned

that she had in fact been with Adam.

Azures began to watch Luanne closely to keep her away from Adam. They also filed a complaint in Tribal Court alleging that Adam had contributed to Luanne's delinquency by enticing her out of the family residence against her parents' wishes and after curfew. The complaint asked that Adam be restrained from further contributing to her delinquency and that he be kept away from Azures' residence at all times. Sometime after the complaint was filed, Arrow Weinberger came to the Poplar area from Fort Smith, Arkansas.

On December 1, Luanne again ran away from home. Azures were convinced that Luanne was with Adam based upon the Williston incident. They immediately enlisted the help of local law enforcement officers and began to search for Luanne and for Weinbergers. At the Azures' request, police stopped Arrow Weinberger's Cadillac to look for Luanne. Both Adam and Arrow later went to Azures' home to register their displeasure at being stopped. Arrow was angry and told Azures that he did not like to get upset "because when I get upset, I stay upset . . ."

Azures continued to search the Poplar area for Luanne. On the evening of Friday, December 4, they contacted Roy Trottier, a federal Indian police officer, and sought his help. The next morning, Azures discovered that Luanne had been seen with Adam on the day she disappeared. They immediately contacted Trottier and told him that if they found Adam they would report his whereabouts to the police and that if they found Luanne they would bring her to the police. Trottier approved the plan. Luanne had, in fact,

been in contact with Adam Weinberger and he knew that she was in the Billings area. She planned to go to Fort Smith, Arkansas, with him.

Scotty and Gloreen Azure then began to search for Adam Weinberger's car. They later enlisted the help of Gloreen's sister, Carol Lee Azure, and Carol Lee's husband, Rodney. Rodney was Scotty Azure's cousin. Carol Lee and Rodney Azure found Adam's car in Brockton that afternoon and notified the police. The police dispatcher sent an officer to Brockton, but he apparently was unable to locate the car. Carol Lee and Rodney then attempted to find Scotty and Gloreen Azure. They encountered the Azures following Adam Weinberger's car on the Fort Kipp Road and turned around to follow the cars toward Culbertson. The three cars were then passed by Arrow Weinberger's white Cadillac. At a signal from Adam, Adam and Arrow pulled their cars to the side of the road and stopped. The two Azure cars proceeded into Culbertson and stopped at the Standard gas station. Scotty parked at the side of the station. Rodney parked several car lengths behind a red pickup that was also parked at the side of the station. The two Azure women went into the station to ask the attendant to call the police dispatcher. Scotty and Rodney remained outside.

At the time of the roadside stop, each Weinberger vehicle had two occupants. Arrow Weinberger was accompanied by his brother, Frank. Adam was accompanied by a hitchhiker named Thomas Hanzlick. When Adam returned to his car at that stop after talking with Arrow, he told Hanzlick that Arrow was going to "run down" the Azures and talk to them.

The Weinberger vehicles continued into Culbertson and

-4-

also stopped at the Standard station. Arrow parked his car almost directly behind Scotty Azure's with about six feet of space between the vehicles. Adam parked his car angling into the passenger's side of Scotty's car with several feet of clearance between the vehicles. The red pickup truck was parked parallel to the driver's side of Scotty's car at a distance of nine and one-half feet away.

Scotty Azure stood between his car and the red pickup near the open driver's door of his car as Weinbergers pulled into the station. Arrow got out of his car and told Scotty to leave his son alone. Adam crossed between Scotty's car and Arrow's Cadillac to the back of the red pickup, saying, "get your bat out, Azure." He then began to drag a logging chain out of the pickup which he doubled over and started to swing at Scotty. Rodney Azure grabbed the other end of the eighteen-foot-long chain as Adam threw the chain toward Scotty. Scotty deflected the chain with a baseball bat he had retrieved from his car. Arrow Weinberger then drew a .25 caliber pistol and shot Scotty Azure once in the chest, killing him instantly. Arrow claimed that he acted in self-defense after Scotty had hit him with the bat once and tried to hit him again. Other witnesses placed the two at a distance of fifteen-to-twenty feet apart. The jury found Arrow Weinberger guilty of deliberate homicide.

Arrow Weinberger presents this Court with six issues on appeal:

1. Whether the instructions taken as a whole correctly defined the offense of deliberate homicide;

2. Whether certain hearsay testimony should have been submitted to the jury;

3. Whether "other crimes" evidence was erroneously introduced against defendant;

4. Whether the prosecution's trial tactics deprived defendant of a fair trial;

5. Whether section 46-18-232, MCA, which allows imposition of trial costs against a convicted defendant, is unconstitutional; and

6. Whether defendant was properly sentenced.

Defendant first argues that a jury instruction defining deliberate homicide omitted an essential element of the crime. Instruction No. 11 provided:

> "You are instructed that to sustain the charge of Deliberate Homicide against Arrow Weinberger the State must prove that the Defendant Arrow Weinberger purposely or knowingly performed the act or acts causing the death of Floyd Azure.
>
> "If you find from your consideration of all the evidence that this proposition has been proved beyond a reasonable doubt, then you should find Defendant Arrow Weinberger guilty of Deliberate Homicide." (Emphasis added.)

Defendant challenges this instruction as incomplete on the basis that it allowed the jury to convict him of deliberate homicide if it found he intended to perform the act which caused death rather than intending death as the result of the act. We disagree for several reasons.

First, this instruction, taken in context with the other instructions and placed within the framework of the issues and arguments presented throughout the trial, did not allow the jury to convict Arrow if it found that he had only intended to pull the trigger. This Court has recognized that in the case of deliberate homicide, the requisite mental state attaches to the result:

"In Montana, a person commits the offense of deliberate homicide if he purposely or knowingly causes the death of another human being . . . The statutorily defined elements of the offense, each of which the State must prove beyond a reasonable doubt, are therefore causing the death of another human being <u>with the knowledge that you are causing or with the purpose to cause the death of that human being</u>." (Emphasis added.) State v. McKenzie (1978), 177 Mont. 280, 327-328, 581 P.2d 1205, 1232, vacated on other grounds, 443 U.S. 90§? 99 S.Ct. 3094, 61 L.Ed.2d 871.

Here, we find that the jury was thoroughly instructed and could not have convicted Arrow unless it found that he had performed the act or acts causing Azure's death with the knowledge that he was causing or the purpose to cause Azure's death.

At the outset of trial, the jury was informed that the specific charge against Arrow was that:

". . . Arrow Weinberger purposely or knowingly caused the death of Floyd Azure by shooting him in the heart area of the chest with a .25 calibre automatic pistol causing Floyd Azure to die almost instantly from a severed pulmonary aortic artery . . ."

From that point, the focus of the trial was on the events leading to Azure's death and on whether the shooting was deliberate, accidental or an act of self-defense. Arrow presented extensive direct testimony that conflicted with the State's evidence and he presented evidence through cross-examination that supported the defense theories of accident or self defense. The jury was thoroughly instructed on both theories and both were thoroughly argued. In fact, no fewer than twelve instructions of the fifty-five given to the jury defined self-defense, the circumstances in which it may be used, and the permissible amount of force which may be used. Where "all the instructions, reviewed as a whole,

-7-

fairly and accurately present the case to the jury," we will not overturn a conviction. State v. Riley (1982), ____ Mont. ____, 649 P.2d 1273, 1281, 39 St.Rep. 1491, 1501; State v. Johnson (1982), ____ Mont. ____, 646 P.2d 507, 512, 39 St.Rep. 1014, 1020.

In addition to the self-defense instructions, the jurors were instructed: that they must consider the instructions as a whole (#1); that each material allegation and fact charged under the specific charge against Arrow must be proved beyond a reasonable doubt (#8); that the requisite mental state was "purposely" or "knowingly" with regard to the result of the conduct described by the statute defining an offense (#31, #32); the statutory definition of "purposely" and "knowingly" (#31, #32); the statutory definition of deliberate homicide (#10); that both act and mental state must be proved beyond a reasonable doubt (#39); that a person must have the requisite mental state with respect to each element of the offense (#24); that death occurring from accident or misfortune is not sufficient to convict of deliberate homicide (#15); that the fact a death occurred is not sufficient proof, standing alone, that a crime was committed (#16).

We reject the tortured interpretation the dissenters give to Instruction No. 11. They argue that Instruction No. 11 is in conflict with the other instructions. Viewed in context of the facts of this case, the arguments presented at trial, and all of the instructions charged to the jury, we find their stance untenable. We hold that the instructions taken as a whole fairly and accurately presented the case to the jury and were sufficient.

-8-

The second basis on which we reject a challenge to Instruction No. 11 is that defendant did not properly object to it; nor did he take the opportunity presented at trial to cure any deficiency in the instruction. As instructions were being settled, the State offered its proposed Instruction No. 8, which was given as the Court's Instruction No. 11. The following exchange took place:

"MR. CHARLES MOSES [Defense Counsel]: We would object to Plaintiff's 8 upon the following grounds, upon the following grounds: that this is an element and issues instruction and it is incomplete; the State is required to prove, number 1: the State is implying that it was done knowingly or purposely; number 2, that it was done with intent to kill, which requires under deliberate homicide a specific purpose to kill under the statute; number 3, that it has to be committed within the county; number 4, the death must be a result of deliberation.

"THE COURT: Do you have instruction like that in yours?

"MR. CHARLES MOSES: No I don't have that.

"THE COURT: Well if you will prepare one that has all of those things, we will take a look at it.

"MR. MOSES: Okay, Your Honor.

"THE COURT: Otherwise, I believe I will give this one.

". . .

"THE COURT: I will give it unless--I don't think we have to allege that it was in Roosevelt County, that is a legal question. Culbertson is in Roosevelt County, Montana, and the act was committed in Roosevelt County, Montana and in addition I would take judicial notice of the fact that Culbertson is in Roosevelt County, Montana. I don't think that these instructions have to have all that stuff in it. 8 will be given. As I understand it you're saying and it is your position that you have to prove specific intent in the statutory language, purposely, knowingly under the

-9-

United States Supreme Court rulings?

"MR. CHARLES MOSES: Right." (Emphasis added.)

While defendant objected on the ground that the instruction was incomplete, it is apparent from the discussion that then followed that the crux of the objection was that it did not require that the State prove a specific intent to kill but that it allowed the State to imply such a specific intent within the statutory mental states of purposely or knowingly. Defense counsel argued first that the jury be instructed that defendant must have had a specific purpose to kill and that the death must have been a result of deliberation. He also argued that the jury be instructed that the crime had to have been committed within the county. The District Court took judicial notice of venue. The first argument propounded by defense counsel is not the law in Montana.

The State need not establish a specific purpose to kill. Nor must it show that death was the result of deliberation other than the deliberation implicit within the statutory definitions of "purposely" and "knowingly." State v. Sharbono (1977), 175 Mont. 373, 392, 563 P.2d 61, 72-73. See also, Criminal Law Commission Comments to section 45-5-102, MCA.

Where a person is aware that it is highly probable that a certain result will be caused by his conduct, he acts knowingly with respect to the result of that conduct. Section 45-2-101(33), MCA. Where it is a person's conscious object to engage in certain conduct or to cause a particular result he acts purposely with respect to that conduct or its result. Section 45-2-101(58), MCA. The Compiler's Comments

to section 45-5-102, MCA, at 123, defining deliberate homicide, note that:

> "'Purposely' . . . is the most culpable mental state and implies an objective or design to engage in certain conduct, although not particularly toward some result. 'Knowingly' . . . refers to a state of mind in which a person acts, while not toward a certain objective, at least with full knowledge of relevant facts and circumstances. Together these terms replace the concepts of malice and intent . . . premeditation is no longer an element of homicide . . ." (Emphasis added.)

We agree. We have previously recognized the legislative changes in the requirements of mens rea. State v. Sharbono, supra, 175 Mont. at 392-394, 563 P.2d at 72-73; State v. Coleman (1978), 177 Mont. 1, 30-31, 579 P.2d 732, 750, cert. denied, 448 U.S. 914, 101 S.Ct. 34, 65 L.Ed.2d 1177. Here, defendant's objection to Instruction No. 11 on the ground that it was incomplete is founded upon mens rea requirements that are no longer the law in Montana.

Defendant also failed to take the opportunity provided by the District Court to draft an alternative instruction. Instead, after instructions had been read to the jury and the State had presented its initial final argument, defense counsel resubmitted its proposed Instruction No. 35: "You are instructed that with respect to the crime alleged of deliberate homicide, a specific purpose to kill is an element of such a charge and must be proven beyond a reasonable doubt." This proposed instruction was properly refused both times. We conclude that defendant's contention that Instruction No. 11 was incomplete is without merit.

Defendant next challenges the introduction of certain hearsay statements into evidence. He raises three separate

arguments in attacking admission of the hearsay statements. First, he contends that two preshooting statements were not admissible because they were hearsay or double hearsay and because they were irrelevant. Second, he contends that the State failed to give notice of two admissions pursuant to section 46-15-303, MCA, and should therefore not have been allowed to introduce the statements. Third, he contends that the admission of four inculpatory statements made by Adam, his nontestifying codefendant, were Bruton infractions that violated the confrontation clause of the Sixth Amendment to the United States Constitution. Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.

The preshooting hearsay statements that were admitted and that defendant challenges were made by Gloreen and Luanne Azure. Gloreen Azure was questioned during cross-examination on her basis for believing that Weinbergers might know of Luanne's whereabouts. The State was allowed to develop those reasons on redirect examination and testimony on Adam's involvement in Luanne's trip to Williston was admitted. Gloreen was also asked why she believed that Arrow could be involved with Luanne's disappearance. She answered:

> "I was told that he was on his way up
> here, and he didn't care how much money
> it cost him, and he was bringing a lawyer
> and he was going to prove that his son
> was an angel . . ."

Luanne was questioned on Weinbergers' knowledge of her whereabouts during early December. She testified that she and Adam planned to go to Arkansas; that she left a note telling him she was going to Billings; that he showed the note to Arrow; and that Arrow said it "sounded good" to him.

-12-

Both statements were objected to as hearsay, or as double hearsay, pursuant to Rule 805, Mont.R.Evid.

The District Court properly allowed the first statement into evidence with an instruction that it was not offered to prove the truth of the matter asserted but was offered only to show why Gloreen acted and believed as she did. The statement was relevant to the issue of defendant's state of mind and motive. In a case where self-defense is raised, the state of mind and intent of the defendant is the primary issue. The jury is entitled to know, so far as evidence is available, all the facts and circumstances which tend to throw light upon the parties and their relations and feelings toward each other. State v. Hollowell (1927), 79 Mont. 343, 356-357, 256 P. 380, 385. The jury was entitled to view Scotty Azure's death in the context of these prior events. State v. Riley, supra, 649 P.2d at 1280, 39 St.Rep. at 1499.

Most of Luanne's statement was nonobjectionable and was properly admitted. Only the second part of the statement (Arrow's knowledge and approval of Luanne's trip to Billings) should not have been admitted into evidence. Defendant contends that viewed in the context of Gloreen's statement and the reference made to the tribal complaint filed against Adam, the comment was prejudicial. We will address this contention within the framework of defendant's argument on "other crimes" evidence.

Defendant argues that Luanne's statement constitutes evidence of other crimes and that it does not meet the four-prong test of admissibility that this Court set forth in State v. Just (1979), _____ Mont. _____, 602 P.2d 957, 36

-13-

St.Rep. 1649. We agree that it does not meet the Just test. It need not. We reject defendant's contention that it constitutes evidence of other crimes. Defendant failed to object to admission of the statement at trial on these grounds and may not do so now. State v. Campbell (1981), ____ Mont. ____, 622 P.2d 200, 202, 38 St.Rep. 19, 22. Nor has Arrow convinced us that the jury would recognize as "another crime" the tenuous connection he attempts to draw between: (1) a complaint filed against Adam in Tribal Court; (2) Adam's plan to take Luanne to Arkansas; (3) Arrow's knowledge that Luanne left a note saying she went to Billings; and, (4) Arrow's statement that "it sound[ed] good to [him]." The connection appears to be too flimsy to merit serious consideration. In a criminal case where prejudice is alleged, it must be established from the record that a substantial right was denied. State v. Dupre (1982), ____ Mont. ____, 650 P.2d 1381, 1386, 39 St.Rep. 1660, 1666; section 46-20-701, MCA. Defendant has failed to demonstrate such prejudice.

Defendant next challenges the introduction of several statements which were not included within the "Notice of Confessions and/or Admissions" filed by the State in response to defendant's motion requesting production of such statements. Defendant contends that the District Court erred in ruling that the motion was moot as a result of the notice filed. We agree. Section 46-15-303, MCA, provides:

> "Motion to produce confession or admission. (1) On motion of a defendant in any criminal case made prior to trial, the court shall order the state to furnish the defendant with a copy of any written confession or admission and a list of the witnesses to its making. If the defendant has made an oral confession or admission,

a list of the witnesses to its making
shall be furnished.

"(2) The list of witnesses may, upon
notice and motion, be amended by the
state prior to trial.

"(3) No such confession or admission
shall be received in evidence which has
not been furnished in compliance with
subsection (1) unless the court is satis-
fied that the prosecutor was unaware of
the existence of such confession or ad-
mission prior to trial and that he could
not have become aware of such in the
exercise of due diligence." (Emphasis
added.)

The record does not support a finding by the District
Court that the prosecutor was unaware of the existence of
the statements. The District Court therefore had no discre-
tion to allow the statements into evidence.

The first statement was made by Adam in the service
station after the shooting. He said, "What do you expect,
they were tailgating us." The prosecutor failed to provide
this statement to defendant since he first became aware of
it after the "Notice of Confessions and/or Admissions" was
filed. The District Court properly provided defense counsel
the opportunity to interview all possible witnesses to the
making of the statement before it was allowed into evidence.
The second statement was made by Adam to the hitchhiker,
Hanzlick. As Adam stopped at the service station, he asked:
"Are you ready to fight?" Defense counsel objected to the
State's attempt to introduce this statement in its cross-
examination of Hanzlick. After discussion outside the
presence of the jury, the District Court struck the state-
ment and used an admonishment framed by defense counsel to
instruct the jury to disregard it. No motion for mistrial
was made. The existence of a similar statement ("we might

see a fight") had been provided in an affidavit supporting the amended complaint and its admission had been argued earlier in the trial.

Defendant has failed to demonstrate prejudice arising from the failure to provide notice of these statements as distinguished from the introduction of the statements themselves. The purpose of the statute requiring production of confessions and admissions is to allow the defendant to prepare a defense to the statements. Here, defendant was given the opportunity to interview any possible witnesses to the making of the first statement before it was introduced. The second statement was not admitted, and the jury was admonished with an instruction prepared by defense counsel. While the substance of the statements may have been detrimental to defendant, he has not demonstrated prejudice stemming from the State's failure to produce the statements prior to trial.

Defendant finally argues that four statements attributed to his nontestifying codefendant were admitted in violation of the confrontation clause of the United States Constitution. The four out-of-court statements were introduced through four witnesses.

Gloreen Azure testified that after the shooting Adam said to her, "I hope you are satisfied, you caused all of this trouble." Rodney Azure testified that after the shooting Adam said to him, "What did you expect, they were tailgating us." The third statement was introduced through the testimony of Arthur Sarnow, who transported the Weinbergers and Tom Hanzlick from the scene of the shooting. He testified that Adam turned toward Arrow Weinberger, Frank Wein-

-16-

berger, and Hanzlick and said, "That's one and four to go." The last of the statements was Hanzlick's stricken statement. Adam asked, "[a]re you ready to fight?" as they drove into the service station. Arrow contends that these statements violate the rule announced in Bruton.

In Bruton the United States Supreme Court held that "where the powerfully incriminating extrajudicial statements of a codefendant who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," limiting instructions to the jury to disregard the statements inculpating the defendant are inadequate. Bruton, supra, 391 U.S. at 135-136, 88 S.Ct. at 1628, 20 L.Ed.2d at 485. The facts in Bruton are clearly distinguishable from the case before us.

In Bruton the nontestifying codefendant, Evans, confessed orally that he and Bruton committed a robbery. The confession was admitted, and the jury was instructed that it was competent only against Evans. The Court reversed based upon, first, the fact that the statements were "powerfully incriminating" and "devastating" to Bruton and, second, upon the recognized motivation to shift blame onto others. It concluded that:

> "The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed." Bruton, supra, 391 U.S. at 136, 88 S.Ct. at 1628, 20 L.Ed.2d at 485.

Extrajudicial statements of a nontestifying codefendant do not always require reversal. State v. Powers (1982), _____ Mont. _____, 645 P.2d 1357, 1363, 39 St.Rep. 989, 996; Harrington v. California (1969), 395 U.S. 250, 89 S.Ct.

-17-

1726, 23 L.Ed.2d 284; Schneble v. Florida (1972), 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340. A criminal defendant is entitled to a fair trial but not a perfect one. State v. Powers, supra; Bruton v. United States, supra. In accord, Lutwak v. United States (1953), 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593; Brown v. United States (1973), 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208; Michigan v. Tucker (1974), 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182.

Where a statement has been edited to remove specific references to codefendants, it is admissible in a joint trial. United States v. Stewart (5th Cir. 1978), 579 F.2d 356, cert. denied, 439 U.S. 936, 99 S.Ct. 332, 58 L.Ed.2d 332; United States v. Holleman (7th Cir. 1978), 575 F.2d 139; United States v. Dady (6th Cir. 1976), 536 F.2d 675 (per curiam); United States v. Wingate (2nd Cir. 1975), 520 F.2d 309, cert. denied, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84; United States v. Alvarez (3rd Cir. 1975), 519 F.2d 1052, cert. denied, 423 U.S. 914, 96 S.Ct. 221, 46 L.Ed.2d 143; United States v. Panepinto (3rd Cir. 1970), 430 F.2d 613, cert. denied, 400 U.S. 949, 91 S.Ct. 258, 27 L.Ed.2d 256; United States v. Lipowitz (3rd Cir. 1969), 407 F.2d 597, cert. denied, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466.

Similarly, where a statement is not powerfully incriminating but implicates the complaining defendant "only to the extent that the jury may make inferences based on other clearly admissible evidence," it does not violate the Bruton rule. United States v. Belle (3rd Cir. 1979), 593 F.2d 487, 495 (en banc), cert. denied, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277; cf., United States v. Winograd

(7th Cir. 1981), 656 F.2d 279, 283, cert. denied, 455 U.S. 989; United States v. DiGregorio (1st Cir. 1979), 605 F.2d 1184, 1190, cert. denied, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197; English v. United States (7th Cir. 1980), 620 F.2d 150, 153, cert. denied, 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75. Winograd, DiGregorio and English each analyzed whether the statement was vitally important to the government's case or whether it was simply linkage testimony that was incriminating only in conjunction with other facts. See also, Stinson v. State (Ala.Crim.App. 1981), 401 So.2d 257, 261; Commonwealth v. Rawls (1980), 276 Pa.Super. 89, 419 A.2d 109, 111-112.

Here, we must examine the four challenged statements in the context of the entire trial. Defendant argues that he was denied his right to confront his accusors as guaranteed by the Sixth Amendment of the United States Constitution. We disagree.

The four statements were introduced through four of twenty-three witnesses presented by the State. Defendant presented seven witnesses, including his own testimony. Defense counsel was afforded full opportunity to cross-examine all of the State's witnesses. The statements were not critical to the State's case against Arrow in light of eyewitness testimony describing the final confrontation between Arrow and the victim. Nor were they "powerfully incriminating" to Arrow. None of the statements directly implicated Arrow by name. None directly connected him with Azure's murder. None of the four statements was challenged on the basis of a denial of confrontation. We will examine each statement and its admission into evidence in turn.

The first statement defendant challenges was introduced through Gloreen Azure on redirect examination. The prosecutor asked Gloreen:

> "Q. Do you recall talking to Adam Weinberger, the defendant, at that time, stating to him that 'you had killed him'?
> A. He said I hope you are satisfied, you caused all of this trouble."

No objection was raised at trial to the admission of this statement. On appeal, defendant fails to demonstrate that its admission constitutes prejudicial error. At most, this statement can be viewed as linkage testimony that is incriminating only in conjunction with other facts. It does not demonstrate a codefendant's "recognized motivation to shift blame onto others." Bruton v. United States, 391 U.S. at 136, 88 S.Ct. at 1628, 20 L.Ed.2d at 485. If anything, the statement serves as an admission against interest that tends to incriminate Adam himself. Rule 801(d)(2)(A), Mont.R.Evid. This statement was not vital to the State's case against Arrow. We find no prejudice.

Nor do we find that admission of the second statement was prejudicial. It was introduced through the direct examination of Rodney Azure. Defense counsel first objected to its introduction on the basis that no notice was provided to the defendants of the statement. The District Court remedied that omission by allowing defense counsel to subpoena and interview any possible witnesses to the making of the statement. Counsel next objected on the basis of lack of foundation. The witness then provided testimony on the time, place and people present. Finally, the witness, Rodney Azure, testified as follows:

> "Q. And did you hear him make any statements at that time, Adam Weinberger? A.

I heard it yes.

"Q. You did hear him make a statement?
A. Yes.

"Q. And to whom were they directed? A.
I don't know who they were directed to,
it seems like he was just glaring.

"Q. And what did he say? A. He said
'What do you expect, they were tailgating
us'."

No further objection was raised. Nor has prejudice been demonstrated. This statement again can serve at most as linkage testimony. Without the establishment of other facts, Adam's comment is not powerfully incriminating to Arrow. Nor, in light of the other evidence produced at trial, is it vital to the State's case against Arrow. It does not shift blame from Adam to Arrow. We find no Bruton violation.

The third statement, the most incriminating of the four, is still incriminating only in light of other clearly admissible evidence presented at trial and is therefore mere linkage testimony. It was introduced through the testimony of Arthur Sarnow, a G.V.W. officer for the Montana Highway Department. Sarnow was asked by a sheriff's deputy to assist in moving the three Weinbergers and Tom Hanzlick from the scene of the shooting. The only objection raised by defendant as to Sarnow's testimony was the following objection on the basis of foundation:

"Q. Okay, and while you were in the
patrol car, did you hear one of these two
defendants say anything to the other one?
A. Yes sir I did.

"Q. And who did you hear say something?
A. The young boy in the pink there.

"Q. And who did he say it to? A. To the
back seat where the other three peo-
ple were sitting.

-21-

"Q. And that is where the other defendant was seated? A. Yes, in the middle in the back, yes.

"Q. And do you recall what he said?

"MR. S. MOSES: Your Honor, I am going to ask for a further foundation as to who was sitting in the car.

"MR. RACICOT: We have already did that, Your Honor.

"MR. S. MOSES: You only talked about the defendants though.

"THE COURT: Okay, who was the driver and so on.

"A. Duane Rasmussen, Roosevelt County deputy sheriff was driving.

"Q. And you were sitting where? A. On the passenger side, against the window.

"Q. And where was the defendant Adam Weinberger, the young son sitting? A. The young one was between Duane and I in the front seat.

"Q. And what did he say when he turned around to the back seat? A. He turned towards me to the back seat and he said 'That's one and four to go'."

Again, this testimony incriminates Arrow only when linked with other facts introduced at trial. It does not attempt to shift blame from Adam to Arrow. It rather tends to incriminate Adam himself. No Bruton objection was raised. We find no violation.

The last statement defendant challenges was introduced through the following recross-examination of the hitchhiker, Tom Hanzlick:

"Q. Do you recall when you pulled up with Adam Weinberger in the car and telling me that Adam Weinberger said, when you pulled up in the car and parked at the Culbertson station? A. Yes, do I recall it, yes sir.

"Q. What did he say to you?

"MR. S. MOSES: Your Honor, was it what Adam said?

"MR. RACICOT: Right, what Adam Weinberger said.

"THE COURT: It doesn't refer to someone else?

"MR. RACICOT: It doesn't refer to anybody else, it is what Adam Weinberger said to you. He asked you 'Are you ready to fight?' didn't he? A. Yes sir, he did."

Defense counsel clarified that the statement was made by Adam, potentially a nontestifying codefendant, and allowed the question to be asked and answered without objection. Then objection was raised. It was directed only to lack of notice, however.

After lengthy discussion and consultation of legal textbooks in chambers, the District Court gave the following instruction, which was formulated by defense counsel:

"THE COURT: All right, I am going to instruct the Jury that the latest state- ment that was testified to concerning-- made by Adam Weinberger to this witness should be disregarded by the Jury. You may proceed."

This fourth statement ("Are you ready to fight?") does no more than serve to link Arrow with the other evidence, if that. It certainly does not shift blame from Adam to Arrow. Nor is it powerfully incriminating. It is damaging primarily to Adam himself. We hold that defendant has failed to demonstrate prejudice in the admission of these four statements.

In Dutton v. Evans (1970), 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213, the United States Supreme Court addressed at length the conflict between the right of confrontation and evidence admitted under a hearsay exception. The safeguards the Court recognized as present in the statement admitted in Evans are similar to those we see here.

-23-

The defendant in Dutton v. Evans, supra, was charged with two other men, Wade Truett and Venson Williams, for the execution-style murder of three police officers. Evans was tried separately. Truett testified at Evans' trial. Williams did not. One of the twenty prosecution witnesses was an inmate from a federal penitentiary in Atlanta, Georgia. The inmate testified that he and Williams had been fellow prisoners at the penitentiary when Williams was taken to Gwinnett County for arraignment in the murder charges. Upon Williams' return, the inmate asked: "How did you make out in court?" Williams responded, "If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now." 400 U.S. at 77, 91 S.Ct. at 214, 27 L.Ed.2d at 220. Defense counsel objected to this statement on the basis that it was hearsay and thus violated Evans' right of confrontation.

The United States Supreme Court upheld the introduction of the statement on a number of grounds. The Court first distinguished a line of cases in which state court convictions were reversed because of a denial of the right of confrontation. The Court then particularly examined Bruton and enunciated the differences between it and the Evans case. In Bruton an entire confession of the nontestifying codefendant was admitted without opportunity to effectively cross-examine for the truth of the matters contained within the confession. The Court in Evans emphasized that there was no "recognized exception to the hearsay rule" before it in Bruton. 400 U.S. at 86, 91 S.Ct. at 218, 27 L.Ed.2d at 225, and then refused to equate the Sixth Amendment Confrontation Clause and the evidentiary hearsay rule,

although it acknowledged that both stem from the same roots.

In distinguishing Evans from other confrontation clause cases, the Court noted that the inmate's testimony was not "crucial" or "devastating"; it did not involve the use or misuse of a confession made in the coercive atmosphere of official interrogation; it did not involve a suggestion of prosecutorial misconduct or negligence; it did not involve admission of a paper transcript of proceedings in which cross-examination was nonexistent or inadequate; and, finally, it did not involve wholesale denial of cross-examination.    Evans, 400 U.S. at 87, 91 S.Ct. at 219, 27 L.Ed.2d at 226.

Evans also did not involve a joint trial, as had Bruton.   However, the nature of the statement and the safeguards recognized as present in Evans apply to Adam Weinberger's statements.   The Court noted that:

> "Evans was not deprived of any right of confrontation on the issue of whether Williams actually made the statement related by Shaw.  Neither a hearsay nor a confrontation question would arise had Shaw's testimony been used to prove merely that the statement had been made.  The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements. From the viewpoint of the Confrontation Clause, a witness, under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard."   (Emphasis added.)   Evans, 400 U.S. at 88, 91 S.Ct. at 219, 27 L.Ed.2d at 226.

Similarly, Arrow Weinberger was not denied any right of confrontation on the issue of whether or not the statements were made by Adam and overheard by each of the four witnesses.   While none of the statements were challenged on

-25-

the basis of Bruton or as hearsay, the "state-of-mind" exception to the hearsay rule or Montana's transaction rule would have provided the "recognized exception to the hearsay rule" that was not present in Bruton. Bruton, n. 3, 391 U.S. at 128, 88 S.Ct. at 1623-1624; Rule 803(3), Mont.R.Evid.; State v. Clark (1936), 102 Mont. 432, 58 P.2d 276; In Re Petition of Peterson (1970), 155 Mont. 239, 467 P.2d 281.

In Evans, the United States Supreme Court stated that the confrontation issue arose "because the jury was being invited to infer that Williams had implicitly identified Evans as the perpetrator of the murder when he blamed Evans for his predicament." Evans, 400 U.S. at 88, 91 S.Ct. at 219, 27 L.Ed.2d at 227. In concluding that there was no denial of the right of confrontation, the Court considered several factors. It noted that the statement did not contain an express assertion about past fact; that Williams' personal knowledge of the identities and roles of the other murder participants had been abundantly established by other evidence; and, that the possibility Williams' statement was founded on faulty recollection was remote in the extreme. Finally, the circumstances provided widely recognized indicia of reliability where, as here, the statement was spontaneous and where it was against Williams' penal interest to make it.

Those same factors apply here. None of the statements contained an express assertion about past fact. Adam's knowledge of Arrow's role in the shooting was solidly established through other evidence. The chance that Adam's statements were founded upon faulty recollection is remote in the extreme. The statements were spontaneous and were made

against Adam's penal interest.

The Court ended by stating:

> "The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.' California v. Green, 399 U.S. at 161 . . .
>
> "Almost 40 years ago, in Snyder v. Massachusetts, 291 U.S. 97, Mr. Justice Cardozo wrote an opinion for this Court refusing to set aside a state criminal conviction because of the claimed denial of the right of confrontation. The closing words of that opinion are worth repeating here:
>
> "'There is danger that the criminal law will be brought into contempt--that discredit will even touch the great immunities assured by the Fourteenth Amendment --if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free.' [Citation omitted.]" 400 U.S. at 89-90, 91 S.Ct. at 220, 27 L.Ed.2d at 227.

We agree. Arrow Weinberger has failed to demonstrate prejudice in the admission of these statements. We hold that his right to confrontation was not violated.

Defendant also argues that this Court should recognize as plain error any alleged Bruton violation and should therefore consider these alleged violations even where not preserved by contemporaneous objection. We decline to do so.

The District Court was never given an opportunity to rule on admission of the statements or to correct itself if admission was not proper. We will not put the trial court in error where it has not been given such a chance. State v. Walker (1966), 148 Mont. 216, 223, 419 P.2d 300, 304.

Here, defense counsel was familiar with the Bruton

objection and used it successfully to prevent admission of another statement. No such objection was raised to these four statements. Defendant's contention to the contrary notwithstanding, we also note that both defense counsel were present at trial when three of the four statements were admitted. We reject his representation that less experienced trial counsel failed to make objections which would have been made had both counsel been present. We also refuse to adopt a plain error rule that would allow defendants to lay in the grass and create Bruton violations by failing to object and then withholding one codefendant from the witness stand.

Defendant's fourth argument is that the prosecution's trial tactics deprived him of a fair trial. He argues that the State should not have introduced evidence of the victim's good character in its case-in-chief; that evidence of defendants' character and their plan to take Luanne to Arkansas should not have been admitted; that evidence of the reasonableness of the victim's and his family's actions should not have been admitted; that the State "carefully tailored" its case to avoid calling witnesses who would testify that the victim was the first aggressor; and that the State improperly elicited testimony during its case on the condition of a defense witness at the time of the shooting and improperly sympathized or agreed with statements made by witnesses. We reject these arguments out of hand. No objections were raised at trial on any of the points defendant now challenges. Nor, taken in toto, do these incidents evidence misconduct that prejudiced defendant. Most of the evidence defendant challenges was properly

admitted to provide the jury with all of the facts and circumstances necessary to shed light upon this case.

Character evidence of a victim's peaceful nature may be admitted by the prosecution to rebut evidence that the victim was the first aggressor. Rule 404(a)(2), Mont.R.Evid. Here, the prosecution introduced the evidence through the first witness in its case-in-chief before the defendant had introduced evidence that the victim was the first aggressor. Where the defense raises the issue of self-defense through cross-examination that tends to demonstrate that the victim was the first aggressor, nothing precludes the State from rebutting that argument in its case-in-chief with evidence of the victim's peaceful nature. However, the State should not introduce evidence of the victim's peaceful nature in anticipation of such an argument. Here, no objection was raised at trial and the defendant's claim of self-defense was clearly at issue throughout the trial. Defendant has again failed to demonstrate prejudice.

In his last two arguments, defendant challenges imposition of trial costs and expenses as part of his sentence as unconstitutional and requests that his sentence be vacated since it was based upon erroneous information concerning prior convictions. He argues, first, that section 46-18-232, MCA, is patently unconstitutional since it enhances punishment in retribution for a defendant's exercise of a fundamental constitutional right. We reject this contention.

Section 46-18-232, MCA, prohibits recoupment against an indigent defendant and allows a defendant to be relieved from payment of such costs upon petition to the sentencing court "[i]f it appears to the satisfaction of the court that

payment of the amount due will impose manifest hardship on the defendant or his immediate family . . ." Statutes that allow such a discretionary imposition of costs have been upheld against the due process argument marshalled by defendant. Fuller v. Oregon (1974), 417 U.S. 40, 51-54, 94 S.Ct. 2116, 2123-2125, 40 L.Ed.2d 647, 653-655; United States v. Glover (2nd Cir. 1978), 588 F.2d 876, 878-879; People v. Estate of Scott (1977), 66 Ill.2d 522, 363 N.E.2d 823, 825; cf., Olson v. James (10th Cir. 1979), 603 F.2d 150 (invalidating a Kansas statute imposing obligation to repay costs of appointed counsel regardless of defendant's ability to pay). Montana's statute does no more than deprive "a financially able defendant of available funds which, in fairness, should be remitted to the public coffers." Glover, 588 F.2d at 879, quoting United States v. Bracewell (2nd Cir. 1978), 569 F.2d 1194, 1197.

Nor do we accept defendant's argument that his sentence should be vacated based upon inaccurate information in his sentencing report. A defendant's right to be sentenced on the basis of accurate information is protected where he is represented by counsel at sentencing and is given the opportunity to rebut any inaccuracies. State v. Trangsrud (1982), ____ Mont. ____, 651 P.2d 37, 40, 39 St.Rep. 1765, 1768. He then has an affirmative duty to present evidence to show such inaccuracies. State v. Radi (1979), ____ Mont. ____, 604 P.2d 318, 320, 36 St.Rep. 2345, 2347. Here, defendant was represented by counsel and was presented with an opportunity to rebut the report. He did not do so. Rather, defense counsel reviewed the report and deemed it "appropriate." Defendant should address any chal-

lenge to the equity of the sentence to the Sentence Review Division. This Court will consider only legal issues raised by the sentence.

In conclusion we also address the dissenters' concern with a potential conflict of interest stemming from both defendants being represented by one law firm. We reject their argument. We note, first, that both defendants agreed to joint representation and, in fact, hired the same law firm as private counsel. Both defendants waived a separate trial. Both defendants reconsidered their decision to be jointly represented during the course of the trial and reaffirmed that decision.

Neither the defendant nor the dissenters demonstrate an actual conflict of interest. A defendant has the burden of establishing that such representation in fact created an actual conflict of interest that prejudiced the defendant. The law does not require an affirmative inquiry into whether codefendants agree to joint representation. State v. Henry (1978), 177 Mont. 426, 431, 582 P.2d 321, 323-324. A defendant may waive the right to demand retrial on the issue of conflict of interest of counsel. State v. Gallagher (1973), 162 Mont. 155, 161, 509 P.2d 852, 855. Where, as here, the defenses put forth by the two defendants are not in conflict, a defendant is not deprived of effective assistance of counsel by joint representation. State v. Henry, supra, 177 Mont. at 431, 582 P.2d at 324. We reject the dissenters' objections as mere speculation.

Affirmed.

_____
Chief Justice

-31-

We concur:

_____

_____

_____
                    Justices


Mr. Justice Daniel J. Shea dissenting:

My dissent is a long one, and I do not apologize for the delay.  It will be filed when it is ready.

_____
                    Justice

Mr. Justice John C. Sheehy concurring with the dissent of Justice Daniel J. Shea, and stating further in dissent:

I would reverse the conviction of Arrow Weinberger. The instructions in relation to him were in hopeless conflict.

Under section 45-5-101, MCA, a person commits the offense of criminal homicide if he purposely, knowingly, or negligently "causes the death of another human being." A person commits deliberate homicide under section 45-5-102, MCA, if the criminal homicide is committed "purposely" or "knowingly".

The District Court, in instructing the jury with respect to deliberate homicide, followed the statutes when it instructed the jury in instruction no. 10:

"A person commits the offense of deliberate homicide if:

"(1) He purposely or knowingly causes the death of another human being . . ." (Emphasis added.)

Under the statutory definition, and the portion of instruction no. 10 which we have quoted, the inquiry for the jury was, who caused the death of Azure? Obviously if Azure caused his own death, as in the case of Arrow Weinberger acting in self defense, then the crime has not been committed. It is the statutory scheme that the jury search for the cause of the death in homicide cases.

In this case the District Court elaborated on the statutory definition. In instruction no. 11, it instructed the jury:

"You are instructed that to sustain the charge of deliberate homicide against Arrow Weinberger, the State must prove that the defendant Arrow Weinberger purposely or knowingly performed the act or acts causing the death of Floyd Azure . . ." (Emphasis added.)

-33-

Thus the District Court, by giving instruction no. 11 changed the nature of the inquiry for the jury. Instead of searching for the cause of Azure's death, the jury was instructed to find who performed the acts causing the death of Azure.

Instruction no. 11 created a crime not defined in the Montana statutes, and for Arrow Weinberger, wiped out any self defense. Under instruction no. 11, since Arrow Weinberger performed the acts (even though he may have been acting in self defense) which caused Azure's death, he was guilty of homicide.

Under instruction no. 11, the mere performance of the acts causing Azure's death constitutes a forcible felony. Instruction no. 47 then wiped away completely any self defense available to Arrow Weinberger:

> "You are instructed that the defense of self defense or justifiable use of force is not available to a person who is attempting to commit or committing a forcible felony. A forcible felony is any felony which involves the use or threat of physical force or violence against any individual."

The State admits in its brief that court's instruction no. 11 "failed to define completely the crime charged," but the State contends that the failure of definition of court's instruction no. 10 was cured by other instructions given in the case.

Our annals are full of cases in which we have said that if an instruction is "not as full as it might have been," but the instructions taken as a whole fairly present the case to a jury, we will not reverse the conviction because of an incomplete instruction. However, this rule applies only to incomplete instructions, not to erroneous instructions or those which are at cross purposes with each other. The cases relied upon by the State and by the majority in this case do

not meet the situation here where the court erroneously defined the elements of the crime in instruction no. 11. If there is any single item of instruction that needs to be straight-forwardedly presented in the criminal case, it must be the elements of the crime. We said in State v. Lundblade (1981), _____ Mont. _____, 625 P.2d 545, 548, 38 St.Rep. 441:

> "At a minimum, the District Court must explain or define the crime for the jury. (Citing a case.) In determining whether the instructions did this, we are guided by certain settled principles. First, we must view the instructions as a whole (citing a case) and we will find no error if the instructions as a whole fully and fairly instruct on the law applicable to the case (citing cases)."

Here there is a hopeless conflict in the instructions concerning deliberate homicide in Arrow Weinberger's case. The instructions as a whole do not fully and fairly instruct on the applicable law but confuse the elements of deliberate homicide and strip any meaning from the self defense instructions.

I could cite other instructional conflict, but it would serve no purpose here and would only take up space. It is enough to say that court's instructions no. 24, 31, and 32 do not cure the instructional failure, as the majority contends or the State argues, because in each of those instructions, there is a phrase used "described by a statute defining an offense" to inform the jury how to apply purposely or knowingly as a requisite for mental state. Nowhere in the instructions in this case did the court specifically tell the jury a particular statute that defined the offense. In other words, under instructions 24, 31 and 32, the jury was told to look to a statute for the elements, but the statute was not given to them.

For these and those reasons set forth by Justice Shea, I
dissent.

_____John C. Sheehy_____
                Justice

I concur in the foregoing dissent of Mr. Justice Sheehy.

_____Frank B. Morrison_____
                Justice
